ROB BONTA
Attorney General of California
JESSICA E. TUCKER-MOHL, Star Bar No. 262280
Supervising Deputy Attorney General
MATTHEW T. STRUHAR, Star Bar No. 293973
Deputy Attorney General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, California  94244-2550
  Telephone:  (916) 210-7246
  Fax:  (916) 327-2319
  E-mail:  Matthew.Struhar@doj.ca.gov

ROBERT S. PERLMUTTER (State Bar No. 183333)
SARAH M. LUCEY (State Bar No. 328805)
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone:     (415) 552-7272
Facsimile:      (415) 552-5816
perlmutter@smwlaw.com
slucey@smwlaw.com

Attorneys for Defendant
IAN CHOUDRI, in his official capacity as Chief
Executive Officer of the California High-Speed Rail
Authority, and in his personal capacity

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| CENTER POINT, LLC,<br><br>       Plaintiff,<br><br>    v.<br><br>IAN CHOUDRI, in his official capacity as Chief Executive Officer of the California High-Speed Rail Authority, and in his personal capacity; and DOES 1 through 100, inclusive,<br><br>       Defendants. | Case No. 1:24-CV-01600-JLT-EPG<br><br>**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>The Hon. Jennifer L. Thurston<br>Courtroom:    4<br>Hearing Date:   June 9, 2025<br>Hearing Time:  9:00 a.m.<br>Trial Date:    None set<br><br>Filed Concurrently with Notice of Motion and Motion; Declaration of Ian Choudri; and Request for Judicial Notice |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ............................................................................................................... 1

LEGAL BACKGROUND ................................................................................................... 3

FACTUAL AND PROCEDURAL BACKGROUND .......................................................... 4

    A.    The Authority and the Project ............................................................................ 4

    B.    Center Point ........................................................................................................ 4

    C.    Center Point's inverse condemnation action against the Authority .................... 4

    D.    The alleged CWA violations ............................................................................... 5

    E.    Procedural history ............................................................................................... 6

MOTION TO DISMISS STANDARD ................................................................................ 6

ARGUMENT ...................................................................................................................... 7

I.    Center Point's failure to provide adequate pre-lawsuit notice deprives this Court of jurisdiction. ....................................................................................................... 7

    A.    Center Point gave no notice whatsoever of its intent to sue Choudri in his *personal* capacity and accordingly this Court must dismiss all such claims. ..................... 8

    B.    The Notice was fatally defective because it failed to include Center Point's full contact information, thereby undercutting the central purpose of the CWA's notice requirement. ......................................................................................... 9

    C.    The Notice was insufficient with respect to alleged violations at the "Other Sites." ........ 10

    D.    The Notice failed to provide sufficient information to allow the Authority to identify the dates of its alleged stormwater discharges. .................................. 10

II.    Center Point lacks Article III standing.................................................................. 11

    A.    Center Point's alleged injuries—stormwater discharges onto its Property—are not traceable to the alleged CWA violations, or likely to be redressed by a favorable decision. ............................................................................................ 12

    B.    The SAC does not establish an injury in fact with respect to the alleged procedural violations and the violations at the Other Sites................................................. 14

III.    Center Point's claims—which do not seek to vindicate environmental concerns—are not within the "zone of interests" protected by the CWA.............................................. 16

POINTS AND AUTHORITIES ISO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 1:24-CV-01600-JLT-EPG

IV.    The SAC fails to state a claim with respect to the alleged stormwater discharges.........................19

V.     The Eleventh Amendment bars Center Point's claim for civil penalties........................................20

VI.    The SAC fails to state a claim against Choudri in his personal capacity. .....................................23

CONCLUSION...................................................................................................................................25

POINTS AND AUTHORITIES ISO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 1:24-CV-01600-JLT-EPG

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013).................................................................................................6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................................20, 24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................7, 20

*Carrico v. City and County of San Francisco*,
  656 F.3d 1002 (9th Cir. 2011) ...............................................................................15

*Center for Biological Diversity v. EPA*,
  937 F.3d 533 (5th Cir. 2019) .................................................................................13

*Center for Biological Diversity v. Marina Point Development Co.*,
  566 F.3d 794 (9th Cir. 2009)...................................................................7, 9, 10, 11

*Central Valley Eden Envtl. Defenders v. Champion Home Builders*,
  2024 WL 115386 (E.D. Cal. 2024)....................................................................6, 15

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
  598 F.3d 1115 (9th Cir. 2010) .................................................................................6

*Citizens Coordinating Committee on Friendship Heights, Inc. v. Wash. Metro. Area Transit Auth.*,
  765 F.2d 1169 (D.C. Cir. 1985) ..................................................................... *passim*

*City and County of San Francisco v. Environmental Protection Agency*,
  604 U.S. 707 (2025)...............................................................................................3

*Committee to Save Mokelumne River v. East Bay Mun. Utility Dist.*,
  13 F.3d 305 (9th Cir. 1993) ...................................................................................20

*Dan Caputo Co. v. Russian River Cnty. Sanitation Dist.*,
  749 F.2d 571 (9th Cir. 1984) ..................................................................................16

*Ecological Rights Foundation v. Pacific Lumber Co.*,
  230 F.3d 1141 (9th Cir. 2000) ................................................................................17

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024)..............................................................................................13

*Fleck and Associates, Inc. v. Phoenix*,
  471 F.3d 1100 (9th Cir. 2006) ................................................................................18

*Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*,
  95 F.3d 358 (5th Cir. 1996) ..............................................................................12, 13

POINTS AND AUTHORITIES ISO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 1:24-CV-01600-JLT-EPG

*Friends of the Earth, Inc. v. Laidlaw Environmental Services,*
  528 U.S. 167 (2000) ................................................................................................1, 14

*Gunpowder Riverkeeper v. F.E.R.C,*
  807 F.3d 267 (D.C. Cir. 2015) ...............................................................................16, 17

*Hafer v. Melo,*
  502 U.S. 21 (1991) ..........................................................................................................22

*Hallstrom v. Tillamook County,*
  493 U.S. 20 (1989) ......................................................................................................7, 10

*Headwaters, Inc. v. Talent Irrigation Dist.,*
  243 F.3d 526 (9th Cir. 2001) ..........................................................................................12

*Hyatt v. Yee,*
  871 F.3d 1067 (9th Cir. 2017) ..........................................................................................7

*Idaho v. Coeur d'Alene Tribe of Idaho,*
  521 U.S. 261 (1997) ..................................................................................................20, 23

*Inland Empire Waterkeeper v. Corona Clay Co.,*
  17 F.4th 825 (9th Cir. 2021) ................................................................................... *passim*

*Intri-Plex Technologies, Inc. v. Crest Group, Inc.,*
  499 F.3d 1048 (9th Cir. 2007) ..........................................................................................7

*Kokkonen v. Guardian Life Ins. Co. of America,*
  511 U.S. 375 (1994) ........................................................................................................14

*Lewis v. Clarke,*
  581 U.S. 155 (2017) ....................................................................................................8, 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ........................................................................................................16

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ..........................................................................................12, 15, 16

*NRDC v. California Dept. of Transp.,*
  96 F.3d 420 (9th Cir. 1996) ................................................................................... *passim*

*ONRC Action v. Columbia Plywood, Inc.,*
  286 F.3d 1137 (9th Cir. 2002) ..........................................................................................9

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,*
  494 F.3d 788 (9th Cir. 2007) ......................................................................................7, 13

*Rock Creek Park Station, Inc. v. Blackwell,*
  344 F.Supp.2d 192 (D.D.C. 2004) ..................................................................................19

*Sackett v. EPA,*
  598 U.S. 651 (2023) ........................................................................................................12

*San Francisco BayKeeper, Inc. v. Tosco Corp.*,
    309 F.3d 1153 (9th Cir. 2002) ...............................................................................10, 11

*Shell Oil Co. v. Train*,
    585 F.2d 408 (9th Cir. 1978) ................................................................................3

*Sierra Club v. City of Columbus*,
    282 F.Supp.2d 756 (S.D. Ohio 2003) ................................................................9, 10

*Warren v. Fox Family Worldwide*,
    328 F.3d 1136 (9th Cir. 2003) ..............................................................................6, 8

*Washington Trout v. McCain Foods*,
    45 F.3d 1351 (9th Cir. 1995) ................................................................................3, 9

*Waterkeepers N. California v. AG Indus. Mfg., Inc.*,
    375 F.3d 913 (9th Cir. 2004) ................................................................................11

*Ex Parte Young*,
    209 U.S. 123 (1908) .............................................................................................20, 23


**Federal Statutes**

33 United States Code
    § 1251 *et seq.* .....................................................................................................1, 3
    § 1311 ...................................................................................................................3
    § 1342 ...................................................................................................................3
    § 1365 ...................................................................................................................3, 7, 8, 24

Federal Rules of Civil Procedure
    Rule 12 .................................................................................................................6, 7


**Federal Regulations**

40 Code of Federal Regulations
    § 135.3 .................................................................................................................3, 8, 9, 10


**California Statutes**

California Public Utilities Code
    § 185000 ...............................................................................................................4
    § 185024 ...............................................................................................................4
    § 185030 ...............................................................................................................4
    § 185032 ...............................................................................................................4

# INTRODUCTION

The Clean Water Act ("CWA" or "Act") was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[1] To facilitate this goal, Congress provided for citizen enforcement actions, whereby a "citizen" allegedly harmed by discharges of pollution in violation of the Act could bring a lawsuit to remedy those harms. Thus, in the typical Clean Water Act case, "an environmental plaintiff claiming injury due to discharges [of water pollution] in violation of the Clean Water Act argues that the discharges harm the environment, and that the harm to the environment injures him." *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 199 (2000) ("*Laidlaw*") (Scalia, J., dissenting).

This case turns the purposes of the Clean Water Act—as well as the harms it seeks to redress—on their head. Plaintiff Center Point, LLC, is not an environmental plaintiff, and it does not allege it has been injured by any harm to the environment. Rather, Center Point is a for-profit real estate developer, with no asserted interest in the environment or the waterways allegedly at issue in this case. Center Point claims that the California High-Speed Rail Authority's construction of a portion of the State's first high speed rail project ("Project") is causing stormwater to flow onto Center Point's nearby property ("Property"), and that this stormwater causes Center Point economic harm and diminishes the value of its Property. For the past six years, Center Point has been litigating an inverse condemnation action against the Authority in California state court seeking to recover damages from the Authority (and others) for these same injuries, based on the same alleged stormwater discharges.

Apparently unhappy with the results it could obtain in that case, Center Point filed the instant lawsuit in December 2024. Center Point initially named the Authority as the sole defendant. Belatedly realizing that the Authority is wholly immune from any such suit under the Eleventh Amendment, Center Point filed a first and then a second amended complaint ("SAC"), alleging essentially the identical violations against the Authority's recently appointed Chief Executive Officer Ian Choudri, in both his official and personal capacities.

The SAC suffers from a series of fatal defects that require its dismissal. First, Center Point failed

---

[1] 33 U.S.C. § 1251(a). Unless otherwise indicated, all further statutory citations are to the Clean Water Act, 33 U.S.C. section 1251 *et seq*.

POINTS AND AUTHORITIES ISO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 1:24-CV-01600-JLT-EPG

to provide the required pre-lawsuit notice that Congress mandated to encourage a plaintiff alleging CWA violations to first seek to engage directly with the alleged violator to remedy those violations in a non-adversarial context. Strict compliance with the Act's notice requirements is a jurisdictional prerequisite to commencing a CWA enforcement action. However, Center Point's notice letter ("Notice") to the Authority gave no notice whatsoever *to Choudri*. The Notice was not addressed to him and did not mention him at any point, presumably because Choudri had not yet even been employed by the Authority when Center Point prepared its Notice. Regardless, under black-letter law, Center Point's failure to provide Choudri notice requires the Court to dismiss all claims against him in his personal capacity. The Notice as a whole was also fatally defective because it omitted Center Point's contact information, which the Ninth Circuit has held requires dismissal.

The SAC also suffers from several other jurisdictional defects. First, even assuming the economic injuries alleged by Center Point suffice to demonstrate a cognizable injury in fact under Article III, Center Point has failed to demonstrate the two other essential elements to confer constitutional standing: traceability and redressability. Simply put, Center Point's asserted injury—the discharge of stormwater *onto its Property*—is not traceable to any alleged violation of the CWA, which prohibits discharges *into the waters of the United States*. For the same reason, the economic injuries that Center Point asserts do not fall within the "zone of interests" the Act seeks to protect. Thus Center Point has not—and cannot—establish statutory standing. *See Citizens Coordinating Committee on Friendship Heights, Inc. v. Wash. Metro. Area Transit Auth.,* 765 F.2d 1169, 1173 (D.C. Cir. 1985) ("The Clean Water Act [ ] was enacted not to create a federal tort of [ ] trespass but to protect navigable rivers and streams from pollution.").

The Constitution also bars Center Point from pursuing its claims for civil penalties. As the Ninth Circuit has held in rejecting just such a claim against another transit agency's director, the Eleventh Amendment bars all claims for civil penalties (or other remedies for past violations) in a CWA enforcement action. *NRDC v. California Dept. of Transp.*, 96 F.3d 420, 421-23 (9th Cir. 1996) ("*Caltrans*").

Finally, the SAC is also so devoid of factual detail as to the assertedly central aspects of its claim—stormwater discharges and Choudri's personal liability—that it fails to state a claim with respect

2

to those issues even if it could overcome these multiple jurisdictional hurdles.

Accordingly, the Court should dismiss Center Point's SAC in its entirety. And because Center Point has failed to rectify the defects in its pleadings after twice being given the opportunity to cure them, the Court's dismissal should be without leave to amend.

**LEGAL BACKGROUND**

The Clean Water Act was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). It prohibits the discharge of any pollutant into the waters of the United States ("WOTUS") without a permit. § 1311(a). Under the Act, a National Pollutant Discharge Elimination System ("NPDES") permit may be issued to particular dischargers, allowing them to discharge pollutants into the nation's waters. § 1342(a). The CWA also authorizes each state to implement the CWA through its own permit program, and the U.S. Environmental Protection Agency has authorized California to issue NPDES permits. § 1342(b); *Shell Oil Co. v. Train*, 585 F.2d 408, 410 (9th Cir. 1978). In 2009, California adopted a general NPDES permit to cover stormwater discharges from construction sites throughout the State ("Construction General Permit" or "Permit"). SAC ¶ 23, ECF No. 16. As Center Point acknowledges, the Authority has obtained coverage for the Project at issue under that Permit. *Id.* ¶ 24.

NPDES permits typically include "effluent limitations," i.e., provisions "that specify the quantities of enumerated pollutants that may be discharged." *City and County of San Francisco v. Environmental Protection Agency*, 604 U.S. 707, 710 (2025) ("*EPA*"). They also include "narrative" or "procedural" requirements such as "testing, record-keeping, and reporting requirements, as well as requirements obligating a permittee to follow specific practices designed to reduce pollution." *Id; see also Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 831-32 (9th Cir. 2021).

The CWA authorizes "any citizen" to bring an action to enforce the Act against any person who violates "an effluent standard or limitation." § 1365(a). However, no such action may be commenced until at least 60 days after the plaintiff has given each alleged violator a notice of intent to sue detailing statutorily mandated information. § 1365(b)(1); 40 C.F.R. § 135.3(a). This notice is intended to give the alleged violator an opportunity to address the plaintiff's concerns in a non-adversarial context. *Washington Trout v. McCain Foods*, 45 F.3d 1351, 1354 (9th Cir. 1995).

### FACTUAL AND PROCEDURAL BACKGROUND

#### A.    The Authority and the Project

The Authority is a state agency created pursuant to the California High Speed Rail Act. Cal. Pub. Util. Code § 185000 ("Rail Act"). The Authority's executive director, who also uses the title "Chief Executive Officer," is appointed by its Board of Directors. *Id.*, § 185024(a). Choudri is the Authority's current Chief Executive Officer and began working for the Authority in that capacity on September 16, 2024. Declaration of Ian Choudri ("Choudri Decl."), ¶ 2. Prior to Choudri's tenure, the Authority's Chief Executive Officer was Brian Kelly. *See* ECF No. 1 at 19.

The Rail Act requires the Authority to "direct the implementation of [an] intercity high-speed rail service," and to "prepare a plan for the construction and operation of a high-speed train network" in California. Cal. Pub. Util. Code §§ 185030, 185032; *see also* SAC ¶ 7 (The Authority "is responsible for planning, designing, building, and operating the California High-Speed Train Project."). The Project includes a section between Merced and Fresno, and that section includes a segment known as the California High-Speed Train Construction Package 1 ("CP-1 Segment"). *Id.*, ¶¶ 8, 24. The Authority's construction-related stormwater discharges within the CP-1 Segment are authorized by the Permit, pursuant to which the Authority obtained coverage on May 30, 2014. *Id.*, ¶ 24.

#### B.    Center Point

Center Point is a California limited liability company whose sole member is a California corporation named Equimax Financial Services, Inc ("Equimax"). Authority's Request for Judicial Notice ("RJN"), Exs. 1, 2. Center Point's primary business is "real estate development" (*id.*), and Equimax's primary business is "real estate brokerage and business management" (*id.*, Ex. 3). Center Point owns property between Avenue 10 and Avenue 12 (the "Property"), just north of the City of Fresno, that is within and/or adjacent to the construction corridor for the CP-1 Segment. SAC ¶ 8. As Center Point has admitted in its inverse condemnation action against the Authority (*see* Section E, below), it plans "to develop the [P]roperty as an Inland Port," among other uses. RJN Ex. 4, ¶ 17.

#### C.    Center Point's inverse condemnation action against the Authority

In 2018, the Authority and Center Point stipulated to a judgment in an eminent domain action that the Authority had brought to acquire a portion of property owned by Center Point necessary for

construction of the Project. RJN, Ex. 4, ¶ 12. The following year, in November 2019, Center Point filed a complaint against the Authority and its contractor, asserting claims for inverse condemnation, intentional trespass, private nuisance, and conversion ("Inverse Action"), based in part on allegations that the Authority was subjecting Center Point's Property to flooding.  *Id.*, ¶¶ 18(g), 32. In its Third Amended Complaint in that action, Center Point sought pre-condemnation damages, prejudgment interest, fees and costs (including for engineering, surveying, and appraisals), damages for loss of business goodwill, trespass damages, damages for alleged trespass to timber, and punitive damages against the Authority's contractor. *Id.*, Prayer for Relief. Center Point filed a Notice of Settlement of the Inverse Action on March 26, 2025, on the eve of the scheduled trial. *Id*., Ex. 5 & Ex. 6 at 2. But as of the morning of the date the instant motion is being filed, that case remains pending. *Id*., Ex. 6 at 2.

### D.    The alleged CWA violations

The SAC alleges three categories of CWA violations by the Authority: unpermitted stormwater discharges (SAC ¶¶ 12-14, 29); procedural violations of the Permit (*id.*, ¶¶ 15, 31-71); and violations at sites that are not on or adjacent to Center Point's Property, including sites located in other " areas between Merced and Fresno not within the area of" the CP-1 Segment (the "Other Sites") (*id.*, ¶¶ 72-76). Virtually all of the SAC's specific factual allegations pertain to alleged procedural violations, including the Authority's alleged failure to comply with "runoff reduction requirements" (SAC ¶¶ 32-40), failure "to develop and/or implement an adequate and effective Construction Stormwater Monitoring Program" (*id.*, ¶¶ 41-66), and failure "to develop, implement, and/or maintain a Stormwater Pollution Prevention Plan in accordance with the [Permit]" (*id.*, ¶¶ 67-71).

In terms of actual discharges, the SAC only alleges generally that the Authority has discharged "polluted stormwater" onto the Property and into WOTUS (including the Fresno River, Cottonwood Creek, and the San Joaquin River). *Id.*, ¶¶ 12-14, 29. But it alleges no specific facts concerning these discharges, e.g., when they occurred (other than a broad allegation that the Permit violations are continuous and ongoing), what pollutants they contained, the specific location of the discharges, or how the discharges violated the Permit or the CWA. The SAC also contains no specific factual allegations as to the alleged violations at the Other Sites, including, e.g., where those sites are located, or how exactly the Permit was allegedly violated at each site. *See id.*, ¶¶ 72-76.

### E.   Procedural history

Center Point sent its 60-day Notice of intent to sue to the Authority's Board and its former Chief Executive Officer Brian Kelly on October 29, 2024.[2] Two months later, Center Point filed its initial complaint, which asserted a cause of action for CWA violations against the Authority only. ECF No. 1. A few weeks after that, Center Point filed a First Amended Complaint ("FAC"), which dropped its claims against the Authority, but restated them in essentially identical fashion against Choudri in both his official and personal capacities, and added a state law claim against Choudri in his official capacity. ECF No. 5, ¶¶ 7, 10, 81. After the parties met and conferred as to certain deficiencies in the FAC, Center Point filed its operative Second Amended Complaint on March 25, 2025. *See* Notice of Motion at 2; ECF No. 16. The SAC dropped the state law claim, but retained the CWA claims against Choudri in both his official and personal capacities, including a personal capacity claim for civil penalties. SAC ¶¶ 7, 9-10 & Prayer for Relief, ¶ 4.

### MOTION TO DISMISS STANDARD

Choudri brings this motion under FRCP Rules 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), a party may move to dismiss a claim for lack of subject-matter jurisdiction, and accordingly this rule governs Choudri's arguments regarding Article III standing, the adequacy of Center Point's 60-day notice letter, and sovereign immunity. *See Central Valley Eden Envtl. Defenders v. Champion Home Builders*, 2024 WL 115386 at *3-6 (E.D. Cal. 2024) (reviewing Article III standing and adequacy of CWA notice under Rule 12(b)(1); *Caltrans*, 96 F.3d at 421 (sovereign immunity). Article III of the Constitution "requires those who invoke the power of a federal court to demonstrate standing." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90-91 (2013). "The party asserting federal subject matter jurisdiction **bears the burden of proving its existence.**" *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) (emphasis added). Moreover, on the issues for which Choudri brings a "factual" 12(b)(1) attack supported by extrinsic evidence (namely, whether he could have violated, or has any liability for, the Authority's alleged violations, prior to his commencing work at the Authority in September 2024), the Court need not take the allegations in the SAC as true. *Warren v. Fox Family*

---

[2] The SAC purports to—but does not—attach the Notice. *See* SAC ¶ 2. However, Center Point did attach a copy of the Notice to its original Complaint, and it is available there at ECF No. 1, pp. 19-32.

*Worldwide*, 328 F.3d 1136, 1139 (9th Cir. 2003) ("A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence.").

Rule 12(b)(6) requires a court to examine whether the plaintiff has alleged sufficient facts to state a ***plausible*** claim on which relief can be granted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007). A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action" is insufficient. *Id.* at 555. In evaluating a motion to dismiss under Rule 12(b)(6), a court assumes all material allegations in the complaint are true, but "need not accept conclusory allegations of law or unwarranted inferences." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794 (9th Cir. 2007).

Under both Rule 12(b)(1) and 12(b)(6), "a court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment, as long as the facts noticed are not subject to reasonable dispute." *Intri-Plex Technologies, Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) (quotations omitted) (Rule 12(b)(6)); *Hyatt v. Yee*, 871 F.3d 1067, 1071 n.15 (9th Cir. 2017) (Rule 12(b)(1)).

## ARGUMENT

### I.    Center Point's failure to provide adequate pre-lawsuit notice deprives this Court of jurisdiction.

Before filing a CWA citizen enforcement suit, the plaintiff must provide the alleged violator with a 60-day notice of intent to sue. *Center for Biological Diversity v. Marina Point Development Co.*, 566 F.3d 794, 800 (9th Cir. 2009) ("*CBD*") (citing § 1365(b)(1)). The notice must include:

> sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

*Id.* at 801. Strict compliance with the notice requirement, including the provision of each piece of information identified therein, "is a jurisdictional necessity," without which "the district court must dismiss the action as barred … ." *Id.* at 800; *see also Hallstrom v. Tillamook County*, 493 U.S. 20, 28 (1989) (requiring "strict compliance" with similar 60-day notice provision). As detailed below, Center Point failed to comply with the requirement in four distinct ways.

7

**A.    Center Point gave no notice whatsoever of its intent to sue Choudri in his *personal* capacity and accordingly this Court must dismiss all such claims.**

A CWA plaintiff must provide ***each*** alleged violator with the requisite notice. § 1365 (b)(1)(A) (No action may be commenced "prior to sixty days after the plaintiff has given notice of the alleged violation … ***to any alleged violator*** of the standard, limitation, or order … .") (emphasis added).

Center Point sent its Notice to the Authority's Board of Directors and its former Chief Executive Officer Brian Kelly on October 29, 2024. ECF No. 1 at 19. The Notice is not addressed to Choudri and, indeed, does not mention his name at all. *Id.* Nonetheless, if it were otherwise adequate, the Notice might have sufficed to notify Choudri of Center Point's intent to sue him in his ***official*** capacity. *See Lewis v. Clarke*, 581 U.S. 155, 162 (2017) ("In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself. That is why, when officials sued in their official capacities leave office, their successors automatically assume their role in the litigation.") (citations omitted).

However, the Notice did not provide ***any*** notice whatsoever of Center Point's intent to sue Choudri in his ***personal*** capacity. Nor did it include any details regarding his alleged personal violations. Indeed, ***Choudri did not even commence working for the Authority until just before Center Point sent its Notice*** and therefore could not possibly have been an "alleged violator" during virtually the entire seven-year period covered by the Notice. *Compare* Choudri Decl. ¶ 2 & Ex. 1 (Choudri commenced working for Authority on September 16, 2024); *with* ECF No. 1 at 19, 28 (Oct. 29, 2024, Notice alleging violations since "at least January 1, 2017").[3] Choudri thus never received any pre-lawsuit notice describing the "specific standard, limitation, or order" he is alleged to have personally violated, his "activity alleged to constitute a violation," or the location or dates of such alleged violations, all of which are required. *See* 40 C.F.R. § 135.3(a).

These failures defeat this Court's jurisdiction over Center Point's claims against Choudri in his

---

[3] This Court may properly consider Choudri's declaration. *See Warren,* 328 F.3d at 1139. Moreover, the SAC does not allege that Choudri was the Executive Officer of the Authority during this period, and its own October 29, 2024, Notice—which was addressed to Choudri's predecessor—can be taken as a concession that Choudri was not the Executive Officer when Center Point drafted the Notice. *See* ECF No. 1 at 19.

1   personal capacity, and those claims must therefore be dismissed. *See CBD*, 566 F.3d at 800 (absent

2   notice, "the action is prohibited"); *see also ONRC Action v. Columbia Plywood, Inc.*, 286 F.3d 1137,

3   1143-44 (9th Cir. 2002) (affirming dismissal of two of plaintiff's three claims where plaintiff failed to

4   provide prelawsuit notice of the dismissed claims).

5       **B.    The Notice was fatally defective because it failed to include Center Point's full
           contact information, thereby undercutting the central purpose of the CWA's notice
6           requirement.**

7       "[T]he purpose of giving a sixty-day notice is to allow the parties time to resolve their conflicts

8   in a nonadversarial time period. Once the suit is filed, positions harden and compromise is less likely."

9   *Washington Trout*, 45 F.3d at 1354. To implement this Congressional goal, the notice regulation

10  expressly requires that the notice include "the full name, address, and ***telephone number of the person***

11  ***giving notice***" (40 C.F.R. § 135.3(a) (emphasis added)) ***and*** "the name, address, and telephone number

12  of the legal counsel, if any, representing the person giving the notice" (40 C.F.R. § 135.3(c)).

13      Despite this express requirement, the Notice did not provide Center Point's telephone number.

14  ECF No. 1 at 28-29. Indeed, it expressly directed the Authority and Choudri's predecessor to "***not***

15  contact Center Point directly" (*id.* at 29, emphasis added) and instead provided the telephone number for

16  Center Point's counsel ***only*** and directed that all communication be through him (*id.* at 19, 29).

17      As the Ninth Circuit has explained, this cavalier approach to the CWA's pre-lawsuit notice

18  requirements is fatally at odds with the purpose of the requirements and requires dismissal of the entire

19  case. *See Washington Trout,* 45 F.3d at 1354 (plaintiffs' failure to include their addresses and phone

20  numbers in CWA notice deprived the district court of jurisdiction to hear their claims); *see also CBD*,

21  566 F.3d at 802 (CWA's notice requirements "are not to be looked upon as mere technicalities to be

22  accepted with cold reserve and embraced with velleity. They are to be taken seriously as means of

23  carrying out important public policies.").

24      Center Point's provision of its counsel's phone number cannot rectify this omission. Indeed,

25  taken together with counsel's directive that Center Point ***not*** be contacted directly, this aspect of the

26  Notice only underscores how Center Point's approach here undercut the central purpose of the notice

27  regulations. *See Sierra Club v. City of Columbus*, 282 F.Supp.2d 756, 775 (S.D. Ohio 2003) (rejecting

28  claim that omission of plaintiffs' phone number should be disregarded because the defendant allegedly

9

"could have asked … Plaintiff's counsel for the phone numbers"); *see also id.* (noting that dismissal was compelled because the Sixth Circuit—like the Ninth Circuit—"requires the individuals giving notice to comply strictly with the statutory and regulatory notice requirements"); *San Francisco BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1157 (9th Cir. 2002) ("Following *Hallstrom*, we have 'strictly construed' the notice requirements for citizen suits under the [CWA].""). Because Center Point's Notice failed to satisfy both the letter and the spirit of the Act's notice requirement, the Court should "dismiss the action as barred by the terms of" the CWA. *See CBD*, 566 F.3d. at 800.

C.    **The Notice was insufficient with respect to alleged violations at the "Other Sites."**

Even if the Court could ignore Center Point's failure to include its full contact information, the Notice also failed to provide adequate notice as to the alleged violations occurring at the so-called Other Sites. *See* SAC ¶¶ 72-76 (asserting violations at "numerous locations other than the Project Site"). The Notice failed to identify the specific locations of those alleged violations, the dates on which they purportedly occurred, or the allegedly responsible persons, all of which are required. *See* 40 C.F.R. § 135.3(a). Instead, the Notice merely stated Center Point's asserted belief that the Authority "is committing similar violations as those outlined above at other inactive [Authority] construction sites, including … along the length of the CP-1 within the Risk Level 2 location as well as other Risk Level 2 areas between Merced and Fresno." ECF No. 1 at 28. These abstract, atemporal, and geographically vague allegations were not "specific enough to give [the Authority] the opportunity to correct the problem," and therefore failed to satisfy the notice requirement. *See San Francisco BayKeeper*, 309 F.3d at 1158; *see also CBD*, 566 F.3d at 803 (notice which contained similarly general and non-descriptive language was incompatible "with the purposes of the notice requirement" and therefore required dismissal). The Court thus lacks jurisdiction over any claims related to the Other Sites.

D.    **The Notice failed to provide sufficient information to allow the Authority to identify the dates of its alleged stormwater discharges.**

Adequate prelawsuit notice must include "sufficient information to permit the recipient to identify … the date or dates of" the alleged violations. 40 C.F.R. § 135.3(a). Center Point's Notice alludes vaguely to unlawful stormwater discharges, but it does not include the dates of ***any*** alleged discharges, or otherwise include information sufficient to permit the Authority to identify those dates.

10

*See* ECF No. 1 at 21 (purporting to describe the locations of unspecified stormwater discharges); *id.* at 28 (alleging the date of the violations as since "at least January 1, 2017"). Because this omitted information is required, the Notice is jurisdictionally insufficient as to the discharge violations.

Two Ninth Circuit cases finding adequate notice of the dates of similar alleged stormwater discharges show why. In *Waterkeepers N. California v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 917 (9th Cir. 2004), as here, plaintiff's notice alleged that defendant had unlawfully discharged contaminated stormwater from its property. The notice further alleged that the discharges occurred "during at least every rain event over 0.1 inches," and attached tables listing the precise dates of daily rain accumulation at nearby sites. *Id.* The court held that together this information was adequate to permit the defendant to identify the specific dates of the alleged stormwater discharges. *Id.* at 917-18. Similarly, in *San Francisco BayKeeper*, 309 F.3d at 1158-59, plaintiff's notice, which alleged unlawful storm water discharges from an industrial facility, provided a list of dates "when the San Francisco Bay area received more than one-tenth inch of rain" for the entire multi-year period covered by the notice. This too was sufficient to permit the defendant to identify the specific dates of the alleged violations. *Id.* Conversely, in *CBD*, the court found **insufficient** a pre-lawsuit notice alleging the defendant had engaged in impermissible filling and grading beginning on a particular date, but which provided "no other specific dates." 566 F.3d at 802-03. That "level of generality," the court held, "[was] not really compatible with the purposes of the notice requirements under the CWA." *Id.* at 803.

Here, Center Point's Notice merely alleges that the Authority's "operations in the area of the Project have … caused unlawful dischargers onto the Site" (ECF No. 1 at 21), and that the range of dates covered by the Notice is since "at least January 1, 2017" (*id.* at 28). Thus, it is insufficient for precisely the same reasons as the notice in *CBD*, and it is readily distinguishable from the notice of stormwater discharges found sufficient in *Waterkeepers* and *San Francisco Baykeeper*. Because the Notice was insufficient as to the dates of the alleged stormwater discharges, the Court lacks jurisdiction over those claims. *See CBD*, 566 F.3d at 800.

## II.    Center Point lacks Article III standing.

To demonstrate Article III standing, a plaintiff must establish three elements: (1) an injury in fact, which is "concrete and particularized [and] actual or imminent, not conjectural or hypothetical;" (2)

1  "a causal connection between the injury and the conduct complained of—the injury has to be fairly

2  traceable to the challenged action of the defendant;" and (3) "it must be likely, as opposed to merely

3  speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*,

4  504 U.S. 555, 560-61 (1992) (citations and quotations omitted). To show that an injury is "fairly

5  traceable" to a defendant's discharges, a CWA plaintiff must show that the discharges are "into a

6  waterway in which the plaintiffs have an interest." *Friends of the Earth, Inc. v. Crown Cent. Petroleum

7  Corp.*, 95 F.3d 358, 360-61 (5th Cir. 1996) ("*Friends of the Earth*"). A plaintiff who asserts both

8  "procedural" and "discharge" violations of the CWA must separately establish standing for each. *Inland

9  Empire*, 17 F.4th at 831-32.

10        As explained below, Center Point's asserted injury—the discharge of stormwater ***onto its

11  property***—is not traceable to any alleged violation of the CWA, which prohibits discharges ***into the

12  waters of the United States***. For the same reason, its injury will not be redressed by a favorable decision.

13  Accordingly, the Court must dismiss the entire action for lack of standing. Additionally, even if Center

14  Point could establish causation and redressability, it has not pled an injury in fact with respect to its

15  procedural claims and claims regarding the Other Sites.

16        **A.    Center Point's alleged injuries—stormwater discharges onto its Property—are not
17               traceable to the alleged CWA violations, or likely to be redressed by a favorable
               decision.**

18        Here, the "challenged action" is the Authority's purported violations of the CWA, which

19  prohibits the unpermitted discharge of pollutants into WOTUS. *Headwaters, Inc. v. Talent Irrigation

20  Dist.*, 243 F.3d 526, 530 (9th Cir. 2001); *see also* SAC ¶¶ 16-17 (recognizing same). Thus, to establish

21  standing, Center Point must show its injuries are caused by or traceable to the purported CWA

22  violations, including by showing that it has an interest in the WOTUS allegedly being polluted.

23        Center Point's stated injuries here have ***nothing*** to do with WOTUS or the Authority's purported

24  discharge of pollutants therein. Instead, Center Point alleges that it has been injured by the Authority's

25  discharge of stormwater ***onto Center Point's Property*** and into the groundwater "in and around" that

26  property. SAC ¶¶ 12, 13, 40. ***But the Act does not prohibit the discharge of stormwater onto

27  neighboring properties.*** *Sackett v. EPA*, 598 U.S. 651, 671-72 (2023) ("the [CWA] applies to 'navigable

28  waters'"); *see also Citizens Coordinating Committee*, 765 F.2d at 1173 (CWA "was enacted not to

12

create a federal tort of … trespass but to protect navigable rivers and streams from pollution."). Moreover, the SAC does not allege that Center Point has *any* interest in WOTUS, including, e.g., that its Property contains any WOTUS, or that there is any specific connection between its Property and any WOTUS. Thus, as alleged, Center Point's purported injury—stormwater discharge onto its Property—is not traceable to any violation of the CWA. *See Friends of the Earth*, 95 F.3d at 360-61 (plaintiff's injury not traceable to defendant's discharges into creek because plaintiff's members used a different body of water, and thus lacked an interest in the creek); *see also Center for Biological Diversity v. EPA*, 937 F.3d 533, 545 (5th Cir. 2019) (no causal link between injury and discharge where plaintiff alleged only that he spent time "in the same areas" allegedly affected by the discharges).[4]

For the same reason, Center Point has also failed to show a likelihood that its asserted injury will be redressed by a favorable decision. *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380-81 (2024) (causation and redressability "are often flip sides of the same coin") (quotations omitted). Even assuming that the Authority has violated the CWA, the SAC does not allege any facts showing that the Authority's compliance with the CWA would remedy Center Point's alleged injury. There are simply no specific factual allegations connecting Center Point's Property to WOTUS such that a decision redressing violations of the Act is likely to also redress the alleged impacts to Center Point's Property.[5]

Moreover, this disconnect between Center Point's alleged injury and the purview of the CWA is more than a mere pleading oversight. Instead, it reveals a fundamental flaw with Center Point's action more broadly: it seeks to dress up a garden variety trespass claim as a Clean Water Act violation. In a

---

[4] Indeed, this causal disconnection between Center Point's injury and the alleged violations is reflected in the very language of the SAC, which essentially asserts two separate and distinct harms: one to Center Point's Property, and one to WOTUS. For example, Center Point alleges the Authority "has caused, and will continue to cause, polluted stormwater being discharged onto [the Property] and into the groundwater aquifer, *and* has caused or threatened to cause … polluted stormwater being discharged into WOTUS." SAC ¶ 12; *see also id.* ¶ 13 (Authority's actions have interfered with Center's Point's ability to use its Property and are "*also* causing, or threatening to cause, injury to WOTUS" (all emphases added).

[5] Center Point's conclusory assertion—completely devoid of any facts—that the Authority's discharges are the "functional equivalent of a direct discharge into WOTUS" (SAC ¶ 14) is wholly insufficient to show any connection between groundwater near the Project site and WOTUS more broadly, or groundwater under Center Point's property and WOTUS more specifically. *See Perfect 10*, 494 F.3d at 794 ("[C]ourt need not accept conclusory allegations of law or unwarranted inferences, and dismissal is required if the facts are insufficient to support a cognizable claim.").

13

typical CWA citizen suit, the plaintiff is a nonprofit organization with an environmental mission that asserts associational standing on behalf of members who use WOTUS for recreation, aesthetic enjoyment, or academic purposes. *See*, *e.g.*, *Inland Empire*, 17 F.4th at 830, 832-33; *see also Laidlaw*, 528 U.S. at 199 (Scalia, J., dissenting) ("Typically, an environmental plaintiff claiming injury due to discharges in violation of the Clean Water Act argues that the discharges harm the environment, and that the harm to the environment injures him."). In those cases, the unpermitted discharges—which directly interfere with the members' use of and interest in WOTUS—are a direct cause of the members' injuries.

By contrast, Center Point is a for-profit corporate entity whose primary business is real estate development, and who has no specific interest in, connection to, or use of WOTUS. *See* RJN, Exs. 1 & 2. Thus, even if Center Point has sustained some injury resulting from the Authority's actions at the Project site, it has not alleged—and indeed ***cannot*** allege—any injury ***caused by unpermitted discharges into WOTUS***. Accordingly, the SAC states nothing more than trespass, which may be actionable at common law, but is not actionable under the CWA. *See Citizens Coordinating Committee*, 765 F.2d at 1173 (finding that a shopping mall owner alleging a CWA claim based on fuel seepage from a transit agency's facilities into the mall's basement lacked statutory standing because its claim was redressable as a claim for "trespass … [but] not pollution of a stream without a permit, actionable under the [CWA]"); *see also infra* Part III.

"It is to be presumed that a cause [of action] lies outside" the limited jurisdiction of federal courts, "and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). Center Point does not meet its burden. The SAC simply fails to show that Center Point's injury—stormwater discharge onto its Property—is traceable to violations of the CWA, or that a favorable decision will redress that injury. The Court should therefore dismiss Center Point's action.

### B.   The SAC does not establish an injury in fact with respect to the alleged procedural violations and the violations at the Other Sites.

Even if Center Point could establish causation and redressability (it cannot), it fails to allege any injury in fact with respect to the alleged procedural violations and violations at the Other Sites.

As this Court recently held, a plaintiff asserting claims for procedural violations of the Act must

14

show it was injured by the violations "in a personal and individual way." *Central Valley Eden*, 2024 WL 115386 at *5 (quoting *Lujan*, 504 U.S. at 560). Asserting a mere "generalized grievance" is insufficient. *Id.* In that case, plaintiff asserted its members were injured by defendant's failure to disclose monitoring and compliance reports, but did not allege or otherwise show

> that its members [had] a need for accurate information or for the information to be disclosed, as by members not being able to swim in the water because of fear that there has been increased pollution, which cannot be confirmed or denied without the disclosed information, or by members not being able to provide reliable information for use in educational or commercial settings without the disclosed information.

*Id*. This Court held plaintiff's asserted injuries were "nothing more than a generalized grievance, which has never been enough" to establish injury in fact. *Id.*

By contrast, in *Inland Empire*, 17 F.4th at 832-34, the plaintiff described exactly how its specific members intended to use the information that was not disclosed, including for academic and scientific research and education, and to inform their potential recreational and aesthetic use of the creek in question. The court held this was sufficient to show an injury in fact, noting that, where "possession of [the] information would reduce the risk of injury to a plaintiff who wishes to know whether the water is polluted before using the Creek for recreation," for example, the "increased risk of harm can itself be injury." *Id.* at 833-34.

Here, as in *Central Valley Eden*, the SAC alleges merely that the Authority's "failure to fulfill its reporting, monitoring, and record-keeping obligations as alleged herein cause, or threaten to cause, harm to Center Point's economic interests by depriving it of relevant and important information to reduce the risk of economic injury resulting from the Authority's unlawful discharges onto or across" its Property. SAC ¶ 15. This single, conclusory statement does not describe how any particular violation, or even category of violations, harms Center Point in a "personal and individual way." It does not show how Center Point intends to use any undisclosed information, how access to that information would reduce its risk of injury, or how the alleged deprivation increases its risk of harm. Center Point's threadbare allegation "[is] the sort of 'formulaic recitation' of the requirements for standing against which the Supreme Court has cautioned." *See Central Valley Eden*, 2024 WL 115386 at *5-6 (quoting *Twombly*, 550 U.S. at 555). Without more, its asserted "injury" is "conjectural [and] hypothetical," and nothing more than a "generalized grievance." *Id.* at *4-5; *see also Carrico v. City and County of San Francisco*,

15

656 F.3d 1002, 1006 (9th Cir. 2011) (plaintiff's conclusory allegation that proposition "was intended to, and does, impact [their] operations as landlords" insufficient to establish injury in fact).[6] Because the SAC does not establish an injury in fact with respect to the procedural claims, the Court must dismiss those claims for lack of jurisdiction.

The SAC likewise fails to show an injury in fact with respect to alleged violations at the Other Sites. *See* SAC ¶¶ 27, 30, 73-76 (allegations related to the Other Sites). Indeed, the SAC does not allege ***any*** injury ***to Center Point*** resulting from the alleged violations at these sites. It likewise contains no allegation connecting Center Point to these sites, e.g., by ownership, adjacency, or any other basis. The "injury in fact test … requires that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 562-63. Center Point is not injured by the purported violations at the Other Sites and therefore lacks standing to pursue its claims for those sites.

**III.    Center Point's claims—which do not seek to vindicate environmental concerns—are not within the "zone of interests" protected by the CWA.**

Even if a plaintiff establishes Article III standing, she must also establish statutory standing, which extends "only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quotations omitted). To have statutory standing under the citizen suit provision of the CWA, a plaintiff's claim must "arise from an interest in the environment, and … seek to vindicate environmental concerns." *Dan Caputo Co. v. Russian River Cnty. Sanitation Dist.*, 749 F.2d 571, 574-75 (9th Cir. 1984).

Under this test, courts have consistently held that CWA plaintiffs who assert only economic interests lack statutory standing to pursue their claims, even if those interests are sufficient to establish an Article III injury in fact. In *Gunpowder Riverkeeper v. F.E.R.C*, 807 F.3d 267, 273 (D.C. Cir. 2015), for instance, plaintiff claimed that an agency's violation of the CWA subjected its members' properties to the threat of eminent domain actions. This satisfied Article III standing. But it did not suffice for

---

[6] The SAC's boilerplate assertions that certain procedural violations "have caused, and will continue to cause, an increased volume of stormwater and pollutants being discharged from the Project Site onto the [Property] resulting in flooding and other adverse impacts to Center Point's injury" (*see*, *e.g.*, SAC ¶¶ 40, 44, 71) are likewise insufficient to establish an injury in fact. Moreover, these assertions only reinforce that Center Point's claim ultimately sounds in trespass, and that its fundamental concern is vindicating harm to its property interests, not protecting WOTUS.

statutory standing, since plaintiff "did not allege its members would suffer any **environmental** harm." *Id.* at 274-75 (emphasis added). The court's analysis focused on the purpose of the CWA—"to restore and maintain the chemical, physical, and biological integrity of the Nation's waters"—and held that claims not aimed at vindicating that purpose "fall outside the zone of interests protected by the CWA." *Id.*

Center Point's claims, like those in *Gunpowder Riverkeeper*, fundamentally seek to vindicate economic, not environmental concerns. Specifically, the SAC asserts that the Authority has "interfered with and prevented Center Point's ability to use the Affected Property for agricultural purposes and have caused, inter alia, a reduction in property value and agricultural production, which constitute direct and substantial harm to Center Point's interests." SAC ¶ 13; *see also id.* (Authority has "interfer[ed] with Center Point's ability to use the Affected Property for agricultural and other uses"). Thus, as in *Gunpowder Riverkeeper*, Center Point's express "asserted interest [is in] avoiding harm to its … **property rights**," not in avoiding or vindicating any harm to "the chemical, physical, and biological integrity of the Nation's waters." *See* 807 F.3d at 273 (emphasis added). *Compare Inland Empire*, 17 F.4th at 831-32 (seeking to vindicate degraded water quality conditions in creek and resulting decline in plaintiff's members' aesthetic and recreational interests therein); *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1150 (9th Cir. 2000) (seeking to vindicate pollution in creek, which impaired plaintiff's members' ability to fish, swim, and "enjoy the beauty of the area").

*Citizens Coordinating Committee* is also instructive here. There, a corporation operating a shopping mall asserted analogous claims (as an intervenor) to Center Point here. It claimed injury from a state transit authority facility's alleged pollutant discharges "into a stream approximately half a mile from its premises and from seepage of pollutants into its basement." 765 F.2d at 1172. The court (*id.* at 1173) held that the corporation failed to establish statutory standing:

> The Clean Water Act [ ] was enacted not to create a federal tort of subterranean trespass but to protect navigable rivers and streams from pollution, and to require those who desire to discharge pollutants into the waterways to obtain a permit for doing so. The allegation of fuel seepage into [the mall's] basement was a trespass, actionable at common law, and not pollution of a stream without a permit, actionable under the Clean Water Act.

So, too, here. The injury from alleged discharges of stormwater onto Center Point's Property

17

may be actionable trespass. But it is not the type of injury or interest that the CWA was designed to protect against. *Id.* Indeed, one of the most troubling aspects of this case is that Center Point has already brought, thrice amended, and, since 2019, heavily litigated an action for just such a trespass in state court, seeking redress for the identical injuries it now seeks to address through the Clean Water Act. *See* RJN, Ex. 4, ¶ 18(g) ("Center Point is subject to flooding in the areas [the Authority] installed piping which will direct water onto Center Point property."), ¶ 32 (Authority has "trespassed onto Center Point properties" by "installing … piping to redirect water"); *see also* Factual Background, Section C. Apparently unhappy with the relief it was able to obtain after more than five years of litigation in that case, Center Point now seeks to pursue what is essentially a federal tort of trespass to address those same injuries. This Court should reject Center Point's attempt to (mis)use the CWA to advance its trespass claims.

In this regard, it is telling that, aside from the rote, repetitive, and conclusory allegation that the Authority's alleged violations "are causing, or threatening to cause, injury to [WOTUS]" (*see* SAC ¶¶ 10, 13, 15), the SAC contains no specific allegations whatsoever related to the environment or any particular environmental harm. This failure is especially conspicuous considering previous versions of the complaint, which alleged in part that Center Point was harmed by the Authority's discharges into WOUTS because "its owners, and employees use and enjoy [WOTUS] for recreational and instream purposes." ECF No. 1, ¶ 9; ECF No. 5, ¶ 10. This allegation was at least facially environmental in nature. If it were otherwise cognizable, it could have indicated at least some interest in vindicating an environmental harm. However—after Choudri informed Center Point during the meet and confer process that case law precludes the company from relying on the alleged interests and harms of its owners and employees to establish standing—Center Point dropped this allegation altogether in the SAC, thereby abandoning any pretense of environmental concerns.[7] What remains reveals the true purpose of Center Point's claim: vindicating its allegedly diminished property values and agricultural

---

[7] *See* Notice of Motion at 3; *see also Fleck and Associates, Inc. v. Phoenix*, 471 F.3d 1100, 1005-06 (9th Cir. 2006) (organization asserting associational standing must show that the member interests it seeks to protect are "germane" to its purpose). As noted above, Center Point's corporate purposes are not related to the protection of water for recreation or instream purposes, or even the environment more generally (and Center Point does not allege otherwise).

1   output. *See* SAC ¶ 13.

2        Moreover, the lack of statutory standing is not something that Center Point, a for-profit limited

3   liability company, could address by further amending its complaint to assert an environmental interest in

4   WOTUS, as commercial entities cannot themselves "enjoy the recreational use and aesthetic enjoyment

5   of the environment." *Rock Creek Park Station, Inc. v. Blackwell*, 344 F.Supp.2d 192, 205 (D.D.C. 2004)

6   (commercial entity's claim not within National Environmental Policy Act's zone of interest because

7   commercial entities "cannot establish standing under a recreational use and aesthetic enjoyment of the

8   environment rationale"); *see also Citizens Coordinating Comm.*, 765 F.2d at 1173 ("Though a

9   corporation is a person for some purposes, we would be most reluctant to hold that it has senses and so

10  can be affronted by deteriorations in its environment."). Because this failure cannot be remedied by

11  further pleading, the Court should dismiss Center Point's action without leave to amend.

12  **IV.    The SAC fails to state a claim with respect to the alleged stormwater discharges.**

13        The gravamen of Center Point's claim is that the Authority has discharged "polluted stormwater"

14  into WOTUS and onto the Property, in violation of the CWA. *See*, *e.g.*, SAC ¶ 12 ("The Authority's

15  continuous and ongoing failure to comply with the Act in connection with the Project has caused, and

16  will continue to cause, polluted stormwater being discharged onto the [Property] and into the

17  groundwater aquifer [and] into WOTUS."). Yet the SAC does not contain a single specific factual

18  allegation describing these discharges. Just like Center Point's inadequate Notice (*see supra* Part I.D),

19  the SAC does not say what "pollutants" the discharges contained, or when they occurred, even by

20  reference to a general timeframe. *See id.* It also fails to describe their location, except to state generally

21  that "[t]he Authority's Project activities discharge stormwater and pollutants via overland flow into …

22  the Fresno River, Cottonwood Creek, and the San Joaquin River." SAC ¶ 29. There are no further

23  allegations, e.g., as to where these waterways are located relative to Center Point's Property or the CP-1

24  Segment, or whether each (unspecified) discharge impacted all or only some of the named WOTUS.

25  Finally, the SAC does not describe how or why the alleged discharges violated the Permit, or even

26  specifically allege that they violated the Permit at all.

27        Thus, in stark contrast to the forty-plus paragraphs alleging strictly ***procedural*** violations of the

28  Permit (SAC ¶¶ 31-71), the discharge-related allegations are limited to a handful of conclusory

19

statements that the Authority's "failure to comply with the Act in connection with Project has caused, and will continue to cause, polluted stormwater being discharged onto the [] Property and … into WOTUS." *Id.*, ¶¶ 12-13. As a matter of law, these allegations fail to state a claim for two reasons. First, as Center Point acknowledges, the CWA does not prohibit discharges, or even "polluted" discharges. Rather, it prohibits discharges "***without, or in violation of***," an NPDES permit. SAC ¶ 16 (emphasis added). Thus, the allegations that the Authority "has caused … polluted stormwater being discharged into WOTUS" (SAC ¶¶ 12, 14), without more, do not even state a cause of action under the CWA since Center Point also expressly knowledges that the Authority ***does*** have coverage under the Permit. SAC ¶ 24; *see Committee to Save Mokelumne River v. East Bay Mun. Utility Dist.*, 13 F.3d 305, 307 (9th Cir. 1993) (CWA "prohibits the discharge of any pollutant into navigable waters . . . ***without a permit***") (emphasis added). Second, even if Center Point could allege this essential element of a CWA cause of action for a discharge violation, its conclusory allegations regarding stormwater discharges still would amount to nothing more than the "formulaic recitation of the elements of a cause of action" that the Supreme Court held required dismissal in *Twombly*, 550 U.S. at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (Article III "demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation").

## V.     The Eleventh Amendment bars Center Point's claim for civil penalties.

The Eleventh Amendment prohibits federal courts from hearing suits brought by private citizens against state governments, without the state's consent. *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267-68 (1997). This "immunity extends to state agencies and to state officers who act on behalf of the state and can therefore assert the state's sovereign immunity." *Caltrans*, 96 F.3d at 421. While sovereign immunity bars suit altogether against the state itself, the Supreme Court has recognized a narrow exception to this rule with respect to state officials. *Id.* at 421-22. Specifically, because a state cannot authorize a state officer to violate the laws or Constitution of the United States, a state officer that violates federal law is "stripped of his official or representative character and is subject in his person to the consequences of his individual conduct." *Ex Parte Young,* 209 U.S. 123, 159-60 (1908). But this loss of immunity applies ***only to claims for "prospective injunctive relief that governs future conduct."*** *Caltrans,* 96 F.3d at 422 (emphasis added). A federal court "may ***not*** award retroactive relief [against a

state official] that requires payment of funds from the state treasury." *Id.* (emphasis added).

In *Caltrans,* the Ninth Circuit held that these principles apply fully to CWA citizen enforcement actions. There, NRDC sued Caltrans and its director, James Van Loben Sels, claiming, like Center Point here, that Caltrans was not in compliance with the permit governing stormwater runoff from certain facilities. *Id.* at 421. The district court dismissed all CWA claims against Caltrans, holding it was immune from suit altogether. *Id.* The court also dismissed "***all claims against Van Loben Sels for civil penalties and declaratory relief***, because they too were barred by the Eleventh Amendment." *Id.* at 423 (emphasis added). The court proceeded to trial on "plaintiffs' claims for ***prospective injunctive relief*** against Van Loben Sels individually." *Id.* (emphasis added). The Ninth Circuit affirmed, holding that "the district court scrupulously followed the dictates of the Supreme Court's Eleventh Amendment cases," which prohibited NRDC from pursuing "all claims against Van Loben Sels for civil penalties and declaratory relief pertaining to past violations of the Clean Water Act." *Id.* at 423.

*Caltrans* is directly on point and controlling here. And Center Point has now effectively conceded as much with respect to the Authority itself. After all, Center Point's initial complaint sought retroactive and injunctive relief against the Authority only. ECF No. 1. Belatedly realizing that the Eleventh Amendment barred this claim in its entirety, Center Point then filed its FAC, which dropped all claims against the Authority, restating them in essentially identical fashion against Choudri in both his official and personal capacities. ECF No. 5,  ¶¶ 7, 10; *compare* ECF No. 1, ¶¶ 7, 9. After Choudri informed Center Point that *Caltrans* still barred any claims for civil penalties against Choudri (*see* Notice of Motion at 3), Center Point amended its complaint a second time, again retaining essentially all of the same allegations against the Authority, but still seeking to hold Choudri personally liable for the Authority's violations. SAC ¶¶ 7, 10. The only substantive difference is that the SAC now alleges, in conclusory fashion, that "Choudri has knowingly and/or intentionally caused, allowed, ratified, and/or unreasonably failed to correct the ***Authority's ongoing violations*** of the Clean Water Act at times when Mr. Choudri knew, or should have known, that ***the Authority*** was not in compliance" and that he was allegedly notified of the results of an audit that "***the Authority conducted*** of its compliance with the Clean Water Act … and that, as a result, Mr. Choudri knew, or should have known, that the ***Authority*** was failing to comply with ***its*** clearly established obligations under the Clean Water Act." SAC ¶ 10

21

1   (emphases added); *Id.,* Prayer for Relief ¶ 4 (seeking "civil penalties against Mr. Choudri, in his

2   individual capacity").

3        These conclusory assertions fail to distinguish the instant case from *Caltrans*. Although *Caltrans*

4   does not explicitly discuss whether Caltrans Director Van Loben Sels—who like Choudri was sued

5   "individually" (95 F.3d at 421)—was expressly alleged to have known about Caltrans' Clean Water Act

6   violations and failed to correct them, that is irrelevant. The Court held, as matter of law, that the

7   Eleventh Amendment required dismissal of "***all claims*** against Van Loben Sels for civil penalties." *Id.*

8   at 423.

9        Nor is Center Point's attempt to evade the Eleventh Amendment helped by its newly added

10   citation to *Hafer v. Melo,* 502 U.S. 21 (1991). *See* SAC ¶ 5. That case addressed the question of whether

11   "state officials sued in their individual capacities are 'persons' for purposes of § 1983 [of the Civil

12   Rights Act]" and thus can be held personally liable for violating a plaintiff's civil rights in certain

13   circumstances. *Hafer*, 502 U.S. at 23. The Court held that Hafer—the Pennsylvania Auditor General—

14   could be sued in her personal capacity and held personally liable to pay monetary damages for violating

15   the federal constitutional rights of various employees that she personally dismissed "because of their

16   Democratic political affiliation and support for her opponent in the 1988 election." *Id.* The case turned

17   on the fact that Hafer herself was the "real party in interest" and she was being sued for her own actions,

18   not the actions of her state agency. *Id.* at 25.

19        Subsequent Supreme Court and Ninth Circuit cases have confirmed that the critical question in

20   determining whether claims for civil penalties or other monetary relief can be pursued against state

21   officials assertedly acting in their individual capacity is whether, despite any labels or conclusory

22   pleading allegations, the state is the actual real party in interest:

23        Our cases establish that, in the context of lawsuits against state and federal employees or
24        entities, courts should look to whether the sovereign is the real party in interest to
          determine whether sovereign immunity bars the suit. [ ] In making this assessment, courts
25        may not simply rely on the characterization of the parties in the complaint, but rather
          must determine in the first instance whether the remedy sought is truly against the
26        sovereign.

27   *Lewis,* 581 U.S. at 161-62; *see also id.* at 157-58 (sovereign immunity does not apply to "ordinary

28   negligence action" against tribal official who drove into plaintiff's vehicle because official, not the tribe,

22

POINTS AND AUTHORITIES ISO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 1:24-CV-01600-JLT-EPG

was the real party in interest); *Idaho,* 521 U.S. at 270 (explaining that, even where only prospective injunctive relief is sought against a state officer, courts must avoid "empty formalism" and ensure that "[t]he real interests served by the Eleventh Amendment are not [ ] sacrificed to elementary mechanics of captions and pleading"); *Caltrans,* 96 F.3d at 422 ("In general, federal court jurisdiction will not be found against a state official when the state is the real party in interest.").

Here, the SAC itself makes clear that the Authority is the real party in interest against whom Center Point seeks a remedy. As noted above, it is replete with references to the "Authority's" alleged violations, in virtually identical language as Center Point initially asserted solely against the Authority itself.[8] Moreover, Choudri didn't even work for the Authority until September 2024, ***over seven years after the alleged violations began***. Choudri Decl., ¶ 2; ECF No. 1 at 28 (alleging ongoing violations since "at least January 1, 2017"). Center Point's conclusory allegations that Choudri, in his personal capacity, allegedly knew about "and failed to correct ***the Authority's ongoing violations***" (SAC ¶ 10, emphasis added) do not change the inescapable conclusion that it is "the Authority's violations" for which Center Point seeks a remedy. To the contrary, the SAC contains exactly the type of sham characterization that the Supreme Court rejected in an analogous context as "empty formalism" that would permit an "obvious fiction" to render the doctrine of sovereign immunity meaningless. *Idaho,* 521 U.S. at 269-70; *id.* at 278 (applicability of *Ex Parte Young* exception "is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record") (quotations omitted). The Court should reject Center Point's transparent attempt to make an end-run around the Eleventh Amendment, and dismiss all claims for civil penalties.

**VI.    The SAC fails to state a claim against Choudri in his personal capacity.**

Even if the Eleventh Amendment did not bar all claims for civil penalties against Choudri as a matter of law—and it clearly does—Center Point's claims against Choudri in his personal capacity must still be dismissed because the SAC fails to sufficiently state those claims.

The CWA citizen suit provision allows actions against "any person … who is alleged to be in

---

[8] *Compare* SAC ¶¶ 12-15, 38-40, 43-45, 48, 70-71 ("the Authority's" failure to comply); 30-31, 43, 52, 73, 75 ("the Authority's" violations); 28, 38, 43 ("the Authority's" operations at the Project site)); *with* ECF No. 1, ¶¶ 9, 31-33, 36-38, 41, 63-64 (failure to comply); 23-24, 36, 45, 66, 68 (violations); 21, 31, 36 (operations).

violation of [ ] an effluent standard or limitation" or an order issued by the State or EPA. § 1365(a)(1). The SAC, however, fails to allege that Choudri, in his ***personal capacity***, has violated ***any*** standard, limitation, or order. Instead, as noted above, the SAC refers almost exclusively to "the Authority's" failure to comply with the CWA and the Permit (*see, e.g.*, SAC ¶¶ 12-15, 38-40, 43, 44-45, 48, 70-71), "the Authority's" violations of the CWA (*id.*, ¶¶ 28, 30-31, 43, 52, 73, 75), and "the Authority's" operations at the Project site (*id.*, ¶¶ 28, 38, 43, 50). On their face, none of these allegations can support a claim against Choudri in his personal capacity.

Indeed, the only allegations that can possibly be construed against Choudri in his personal capacity are the general and conclusory statements that he "knowingly and/or intentionally caused, allowed, ratified, and/or unreasonably failed to correct the Authority's ongoing violations" of the CWA (*id.*, ¶ 10), and was "notified of the results" of a compliance audit that the Authority conducted "and that, as a result, [he] knew, or should have known, that the Authority was failing to comply with its clearly established obligations under the" CWA (*id.*, ¶ 10). These threadbare allegations, which do not even state the correct elements of a CWA citizen suit claim, and which contain essentially no "factual matter," are wholly insufficient to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (brackets and quotations omitted). The Court must therefore dismiss Center Point's claims against Choudri in his personal capacity.

Furthermore, as an indisputable factual matter, Choudri did not even commence work at the Authority until September 16, 2024 (Choudri Dec., ¶ 2), and thus he cannot possibly have personally taken any actions himself, or ratified, failed to correct, etc., any actions that the Authority undertook prior to that date. Although the SAC is not clear as to the alleged timeframes of each purported violation, it does assert at least one violation dating back to 2018. *See* SAC ¶ 63 (alleging sampling-related violations beginning in 2018); *see also* ECF No. 1 at 28 (alleging ongoing violations since "at least January 1, 2017"). Accordingly, even if the Court finds that Center Point has stated a claim against Choudri in his personal capacity as a general matter—which it has not—the Court should at the very least dismiss all such personal capacity claims against Choudri for any alleged violations that occurred prior to September 16, 2024.

## CONCLUSION

The Court should dismiss the SAC without leave to amend.

DATED:  April 24, 2025                    SHUTE, MIHALY & WEINBERGER LLP


                                    By:  ___/s/ *Robert S. Perlmutter*___
                                         ROBERT S. PERLMUTTER
                                         SARAH M. LUCEY

                                         Attorneys for Defendant
                                         IAN CHOUDRI, in his official capacity as Chief
                                         Executive Officer of the California High-Speed Rail
                                         Authority, and in his personal capacity

1899313.31

POINTS AND AUTHORITIES ISO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT
Case No. 1:24-CV-01600-JLT-EPG