**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

CENTER POINT LLC,

Plaintiff,

v.

IAN CHOUDRI, et al.,

Defendants.

Case No. 1:24-cv-01600 JLT EPG

ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND IN PART

(Doc. 17)

Ian Choudri, the Chief Executive Officer of the California High-Speed Rail Authority, moves to dismiss Center Point LLC's claims under the Clean Water Act for lack of jurisdiction and for failure to state a claim. (Doc. 17.) The motion is **GRANTED** with leave to amend in part, as explained below.

**BACKGROUND**

Center Point is a California company that owns land in Madera County near a part of the state's high-speed rail project. (Doc. 16 at 3.) Several years ago, the High-Speed Rail Authority obtained some of Center Point's property due to an eminent domain action. (*See id.* at 15–16.) A dispute soon arose, however, and Center Point filed a lawsuit against the state, the High-Speed Rail Authority, and one of its contractors in state court. (*See id.* at 13–15.) Center Point said that the rail construction project had hampered its efforts to farm the orchards it had grown on its land, destroyed some of its trees and soil, diverted water onto its property, prevented it from developing

and refinancing the property, and generally reduced the value of its land. (*See id.* at 17–18.) It pursued a variety of claims under state law, such as inverse condemnation, nuisance, and trespass. (*See id.* at 18–23.)

While the inverse condemnation action was underway, Center Point also filed this federal case, a so-called "citizen suit" under the federal Clean Water Act. (*See* Doc. 1.) It originally pursued its claims against the High Speed Rail Authority directly (*see id.* at 1), but in an amended complaint, it instead sued the Authority's Chief Executive Officer, Ian Choudri (*see* Doc. 5 at 3, 20). Center Point is now proceeding on its second amended complaint, filed in March 2025. (Doc. 16.) Choudri is the only defendant. (*See id.*) Center Point has sued him in both his official capacity as the Authority's Chief Executive Officer and in his individual or personal capacity. (*See id.*)

Center Point makes three broad categories of allegations. In the first, it alleges the High Speed Rail Authority has discharged (and will again discharge) polluted stormwater runoff onto Center Point's land and into the groundwater beneath its land in violation of a discharge permit, and thus in violation of the Clean Water Act itself. (*See, e.g.*, *id.* at 4–5, 6–7; *see also* Doc. 19 at 12.) In the second category of allegations, Center Point contends the Authority has fallen short of a variety of other regulatory and legal requirements, such as its obligations to create and follow plans, to make drawings, to monitor discharges, to take samples, to keep records, and to conduct inspections. (*See, e.g.*, Doc. 16 at 8–17; *see also* Doc. 19 at 12–13.) Finally, Center Point alleges similar problems and violations have cropped up "at numerous other locations" along the route of the high-speed rail line between Fresno and Merced. (*See, e.g.*, *id.* at 17–19; *see also* Doc. 19 at 13.) Center Point is pursuing requests for injunctive and declaratory relief against Choudri in his official capacity, it is pursuing a request for civil penalties against him in his personal or individual capacity, and it is seeking an award of its costs, fees, and any other appropriate relief. (*See* Doc. 16 at 19.)

When Center Point filed its current complaint, the state court litigation was ongoing. (*See* Doc. 17-3 at 28). The parties soon reached an agreement to settle the state court litigation, however, and it was dismissed. (*Id.* at 28; *see also* Doc. 19-3 at 58–63.) The agreement makes

clear that it does not affect this case, which has continued. (Doc. 19-3 at 60.) Choudri now moves to dismiss this case for lack of subject matter jurisdiction and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(1) and (6). (Doc. 17.) That motion is now fully briefed and was submitted without oral arguments. (*See* Docs. 19, 20.)

The Court must begin with its jurisdiction. A federal court can "address jurisdictional issues in any order." *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 4 (2023). Choudri argues first that Center Point did not give notice of its claims before it filed this case, as required by the Clean Water Act. (*See* Doc. 17-1 at 13–17.) The Ninth Circuit has said that the Clean Water Act's pre-filing notice requirements are "a jurisdictional necessity." *See Ctr. For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009). The requirements are the best place to start.

**NOTICE**

Congress allowed "any citizen" to file a lawsuit against "any person" who violates a variety of standards and limitations within the Clean Water Act, including government entities. 33 U.S.C. § 1365(a)(1). It imposed an obligation on the plaintiffs who file lawsuits under this provision to give notice to the alleged violator, to the Environmental Protection Agency, and to the relevant state at least sixty days in advance of the lawsuit, as prescribed in the EPA's regulations. *See id.* § 1365(b)(1)(A); *see also id.* § 1251(d). Under those regulations, the sixty-day notice must include "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated." 40 C.F.R. § 135.3(a). The notice must also allow the recipient to identify "the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, [and] the date or dates of such violation." *Id.* Finally, the notice must include "the full name, address, and telephone number of the person giving notice." *Id.*

The purpose of this notice requirement is "to strike a balance" between encouraging private enforcement actions and "burdening the federal courts with excessive numbers of citizen suits." *Hallstrom v. Tillamook County*, 493 U.S. 20, 29 (1989) (interpreting equivalent provisions of the Resources Conservation and Recovery Act of 1976). An effective notice gives the relevant

government agencies a chance to "take responsibility" for enforcement and administrative actions. *Id.* It also gives the alleged violator "an opportunity to bring itself into complete compliance," *id.*, or at least to speak with the prospective plaintiff in a less adversarial setting, before "positions harden and compromise is less likely," *Wash. Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1354 (9th Cir. 1995).

Federal courts have often come back to these purposes when they have been asked to decide whether a pre-suit notice measured up to the EPA regulation. Courts have been relatively strict when it comes to the name, address, and phone number requirements. *See, e.g.*, *id.* It is not hard to see why. If a notice does not identify its authors and explain how to contact them, it could be very difficult for the recipient to "negotiate" with them "or seek an administrative remedy." *Id.* And so, although missing names, addresses, or phone numbers might seem like "technical deficiencies," they can deprive the district court of its authority to hear the case. *Id.*; *see also, e.g.*, *Sierra Club Ohio Chapter v. City of Columbus*, 282 F. Supp. 2d 756, 775–76 (S.D. Ohio 2003). With that said, district courts have been willing to excuse utterly harmless and trivial omissions and errors. *See, e.g.*, *Cent. Valley Eden Env't Defs., LLC v. Castle & King Rock & Ready Mix*, No. 23-02616, 2025 WL 1411344, at *4–5 (E.D. Cal. May 15, 2025); *Nat. Res. Def. Council, Inc. v. Sw. Marine, Inc.*, 945 F. Supp. 1330, 1333–34 (S.D. Cal. 1996), *aff'd*, 236 F.3d 985 (9th Cir. 2000).

A pre-suit notice is also unhelpful if it does not explain how the recipient ran afoul of the law, so courts have also said that a notice must offer a reasonable level of detail about what happened, where, and when. *See, e.g.*, *S.F. BayKeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1158 (9th Cir. 2002). A notice falls short if it leaves the recipient to play "a guessing game" about what went wrong and when. *Ctr. for Biological Diversity*, 566 F.3d at 801. In *Center for Biological Diversity*, for example, the pre-filing notice accused the defendant of violating the Clean Water Act in construction work that began on a given date, but it did not mention any particular dates, it was unclear what the prospective plaintiff thought the recipient should do in response to the notice, and the notice did not even mention one of the legal theories that the plaintiffs later attempted to pursue in court. *See id.* at 802–03. In another similar case, the

plaintiffs gave the defendant notice that they believed one of its permits was invalid based on a late renewal application. *See ONRC Action v. Columbia Plywood, Inc.*, 286 F.3d 1137, 1143 (9th Cir. 2002). In the ensuing litigation, the plaintiffs argued that the permit had other problems, too. *See id.* In their view, a renewal application would have revealed and corrected these problems, so they were fair game. *See id.* The district court and the Ninth Circuit both disagreed. *See id.* As the Circuit saw it, the defendant "was not required to speculate as to all possible attacks on [the permit] that might be added to a citizen suit." *Id.*

But courts do not demand the impossible, and they do not require unreasonable and unnecessary specificity. *See id.* For example, a plaintiff cannot be faulted if there is no date or place to disclose—say, if the defendant's allegedly unlawful action was a failure to prepare and implement a legally required plan. *See Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 996 (9th Cir. 2000). Nor does the notice regulation demand an exhaustive catalog of "every specific aspect or detail of every alleged violation." *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951 (9th Cir. 2002) (quoting *Pub. Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995)). A notice meets the standard "if it is specific enough to give the accused company the opportunity to correct the problem." *Cottonwood Env't L. Ctr. v. Edwards*, 86 F.4th 1255, 1264 (9th Cir. 2023) (quoting *S.F. BayKeeper*, 309 F.3d at 1158). In one recent case, the plaintiffs had a straightforward theory: a golf course was watering its grass so much that nitrogen pollution was reaching the groundwater and eventually a river. *See id.* at 1259 (9th Cir. 2023). Their notice spelled out this theory, it identified a controlling Supreme Court opinion, and it applied the factors laid out in that opinion. *Id.* This was "more than sufficient." *Id.* at 1264. No greater detail was necessary to understand the claims the golf course faced. *See id.*

Center Point's pre-suit notice letter fell short of these notice standards in two relatively obvious ways. The clearest shortfall relates to its claim that the High Speed Rail Authority is liable for "other" violations at various locations all along the route between Fresno and Merced, ostensibly even in places far from Center Point's land. (*See* Doc. 18 at 11.) The notice did not explain when these other violations occurred, where, or when. It said only that they were

"similar" to the other violations it had "outlined above" and had occurred "at other inactive . . . construction sites" at some time in the seven or more years between January 2017 and October 2024. (*Id.*) In this respect, the Ninth Circuit's decisions in *ONRC Action* and *Center for Biological Diversity*, summarized above, are controlling. *See Ctr. for Biological Diversity*, 566 F.3d at 801 ("We have sometimes been slightly forgiving to plaintiffs in this area, but even at our most lenient we have never abandoned the requirement that there be a true notice that tells a target precisely what it allegedly did wrong, and when."); *ONRC Action*, 286 F.3d at 1143 ("[The defendant] was not required to speculate as to all possible attacks on its [discharge] permit that might be added to a citizen suit when the 60–day notice so specifically identified only one attack based upon timeliness of the renewal application."). This Court has no authority to hear Center Point's claims about these other sites and other violations.

The second clear omission from Center Point's notice was any warning that it was contemplating a lawsuit against Choudri in his individual or person capacity, rather than in his official capacity as the person who was serving as the Chief Executive Officer of the High Speed Rail Authority. The notice letter refers only generically to the Authority's "officials, employees, contractors, and agents." (Doc. 18 at 11.) Center Point did not identify Choudri by name, did not refer to any actions he took on an individual or personal basis, and did not connect him to anyone else who did. In fact, when Center Point sent its notice, Choudri had been serving as Chief Executive Officer for only about a month. (*See* Docs. 18 at 2; 17-2 at 2, 4.) The Authority did not employ him in any capacity before then, and he did not have any responsibility for the Authority's operations or actions before he started. (*Id.*) The month between September and October 2024 was a tiny fraction of the notice's seven-year timespan. (*See* Doc. 18 at 11.) With only the notice to consult, an assessment of Choudri's potential personal or individual liability would amount to guesswork. This Court does not have authority to hear the claims against Choudri in his individual or personal capacity.

Turning back to the claims against Choudri in his official capacity, he argues the notice fell short in two other ways. First, he points out that the notice did not include Center Point's phone number, but rather only a phone number for its attorneys. (*See* Doc. 17-2 at 15.) He does

not say that this omission prevented him or the High-Speed Rail Authority's attorneys from contacting Center Point or discussing the notice. As explained in the background section above, Center Point was in the midst of concurrent litigation with the Authority when it sent its notice letter. The Authority and its attorneys had already received contact information for Center Point and its attorneys in the course of that parallel case. They had also already been communicating with Center Point's attorneys, and those channels of communication were working well enough that their state court case ended in a settlement agreement.

Other district courts within the Ninth Circuit have decided that similarly trivial omissions and errors did not deprive them of jurisdiction. *Nat. Res. Def. Council*, 945 F. Supp. at 1334; *see also, e.g.*, *Central Valley Eden*, 2025 WL 1411344, at *5; *Coastal Env't Rts. Found. v. Am. Recycling Int'l, Inc.*, No. 17-00425, 2017 WL 6270395, at *5 (S.D. Cal. Dec. 8, 2017). In this case, as in those others, there was "no doubt" about who the Authority should contact "to conduct negotiations." *Nat. Res. Def. Council*, 945 F. Supp. at 1334. The situation here was certainly not like the one that resulted in dismissal in *Washington Trout*. It was unclear in that case who was threatening to sue and how to contact them. *See, e.g.* 45 F.3d at 1352 ("[T]he [notice] letter did not provide the address and phone number of the named plaintiff, nor did it furnish the identity, address, and phone number of Washington Trout and the Central Basin Audubon Society.").

Finally, Choudri contends Center Point's notice fell short because it did not go into reasonable detail about the stormwater discharges in question. (*See* Doc. 17-1 at 16–17.) Its notice letter referred to the Clean Water Act as the "Act," to the High-Speed Rail Authority as the "HSRA," to a segment of the high-speed rail line between Fresno and Merced as "the Project," and to its own properties near this "Project" as the "Site." It made several claims. These were the most specific:

- "The HSRA's failure to comply with the Act in the area of the Project has resulted in polluted stormwater being discharged onto Center Point's properties, [into the Fresno River, Cottonwood Creek, and the San Joaquin River] . . . , and/or the underlying groundwater aquifer." (*Id.* at 3.)
- "HSRA's failure to comply with the Act and the resulting unlawful discharges of

pollutants from the Project onto the Site as alleged herein has adversely affected Center Point and caused it actual harm, including flooding Center Point's properties, polluting [the Fresno River, Cottonwood Creek, and the San Joaquin River], and/or polluting the groundwater Center Point relies upon for agricultural uses, and will continue to cause Center Point harm unless and until such unlawful acts and discharges are permanently ceased." (*Id.*)

- "The location of the point sources from which pollutants and stormwater are discharged in violation of the Act consist of the areas encompassed by California High-Speed Train Construction Package 1, as described in [a specifically identified permit], as well as those portions of Center Point's property over which the State and/or HSRA hold easements . . . , including the construction corridor between Avenues 10 and 12 in Madera County, California." (*Id.* at 4.)
- "The Project has caused discharges of stormwater and pollutants in violation of the Act onto [portions of Center Point's property over which the State and HSRA hold easements] as well as other properties owned by Center Point in the area of the Project, thereby harming Center Point." (*Id.*)
- "The [relevant stormwater pollution protection plan] identifies an extensive list of potential sources of stormwater pollutants associated with the HSRA Project's construction activities that could be deposited onto the Site from the Project's stormwater discharges, including but not limited to: masonry products, methyl methacrylate, fly ash/foundry sand, nonpigmented curing compounds, surface cleaners/acids, surface cleaners/bleaches, trisodium phosphate detergent, solvents, batteries, metals, adhesives, salts, asbestos, pesticides/herbicides, fertilizers, resins/sealants, cold mix, solder, flux, and treated wood." (*Id.*)
- "Information available to Center Point suggests that earthen berms may have been used along the outer edge of the [guideway segment between Avenue 11 and Avenue 12], but the 'berm' is nothing more than sparsely vegetated linear piles of dirt, which would not only fail to satisfy [the applicable permit] standards but also

would constitute a source of stormwater pollutants." (*Id.* at 9.)

- "[A]long the [guideway segment between Avenue 11 and Avenue 12], disturbed areas have not been stabilized, and no erosion or sediment control [best management practices] are in place to protect the Site from the discharge of stormwater and stormwater pollutants." (*Id.*)
- "Information available to Center Point indicates several large, eroded areas along the [guideway segment between Avenue 11 and Avenue 12], including a particularly large erosion discharge near Sta 10105+00. This discharge likely occurred during recent storm events." (*Id.* at 10.)

These statements describe locations, sources, and potential pollutants, and they make clear why Center Point believes that there had been discharges in violation of the Clean Water Act. But they do not identify "the date or dates" of the discharges. 40 C.F.R. § 135.3(a). Center Point argues this omission was not fatal, citing the Ninth Circuit's opinion in *San Francisco Baykeeper*. (Doc. 19 at 19 (citing 309 F.3d 1153).) Choudri relies on the same opinion (among others) to press the opposite conclusion. (*See* Doc. 17-1 at 17.)

The Circuit introduced its opinion in *BayKeeper* as a decision about "whether a citizen plaintiff under the Clean Water Act must always notify the defendant of the specific dates of alleged violations in order to pursue claims for those violations." 309 F.3d at 1155. The answer was no, not always: "as long as a notice letter is reasonably specific as to the nature and time of the alleged violations, the plaintiff has fulfilled the notice requirement. The letter does not need to describe every detail of every violation; it need only provide enough information that the defendant can identify and correct the problem." *Id.*

The plaintiff in *BayKeeper* gave notice of three types of violations. First, its notice letter described how the defendant—the operator of a petroleum coke storage and loading facility—had allowed the coke to spill into a slough while it was loading ships on fourteen days as examples of when this occurred. *See id.* at 1158. Second, the letter said that the defendant had allowed high winds to blow coke from uncovered storage piles into the water. *See id.* The letter said that this had happened "on each day when the wind has been sufficiently strong to blow coke from the

piles into the slough." *Id.* Third, the letter claimed that rain had fallen on the uncovered piles of coke and had carried contaminants into the slough and down the drain. *Id.* The letter listed "190 dates between 1994 and 1999 when the San Francisco Bay area received more than one-tenth of an inch of rain." *Id.* It then explained that the defendant had violated the Clean Water Act because it had "failed to implement best available technology to reduce storm water pollution as require by [its permit]." *Id.*

As for the ongoing permit violations, the Circuit decided that "no specific dates were needed." *Id.* (citing *Nat. Res. Def. Council*, 236 F.3d at 996). The allegation that the violations were ongoing was specific enough. *See id.* Second, for the spills that occurred when ships were loaded, the Circuit found that the fourteen sample dates sufficed. *See id.* at 1158–59. The defendant was "in a better position than [the plaintiff] to identify the exact dates, or additional dates, of its own ship loading." *Id.* at 1158. Finally, the Circuit acknowledged that the wind-blown coke allegations made for a "closer question," but it decided specific dates were not necessary in the circumstances. *Id.* at 1159. The notice gave the defendant "an 'opportunity to correct the problem' by enclosing or covering the coke pikes," so its failure to be more specific was not fatal. *Id.* (quoting *Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 951–52 (9th Cir. 2002).

Like the plaintiff in *BayKeeper*, Center Point told the High-Speed Rail Authority in its letter that it intended to sue based on its allegation that the Authority was not using the best available technology to prevent stormwater discharges, as its permit required, in addition to the other ongoing permit problems that it detailed in its notice. By the Circuit's reasoning in *BayKeeper*, Center Point's letter gave adequate notice of this particular theory of liability. No specific dates were necessary to give notice of these allegedly ongoing violations. *See Nat. Res. Def. Council*, 236 F.3d at 996 ("[T]he deficiencies in these plans are ongoing, so there is no specific date that can be alleged as the date of the violation." (citation omitted)). Choudri does not argue otherwise.

By contrast, when it comes to Center Point's allegation that the Authority was allowing polluted stormwater to be discharged from its property, the notice letter did not offer any

particular dates, and there is no reason to believe that the High Speed Rail Authority had any better rainfall or discharge records than Center Point. This makes it impossible to rely on an analogy to the plaintiff's claims about ship-loading spills in *BayKeeper*.

The claims about petroleum coke blown from storage piles in the wind may offer a better comparison. Like Center Point, the plaintiff in *BayKeeper* offered no dates, and there is no reason to think that the defendant was in a better position to identify any dates. So is a claim about wind-blown coke comparable to a claim about stormwater discharges? There are certainly reasons for doubt. High winds, coke piles, and a nearby slough make for a simple problem with an obvious solution, as the Circuit explained in *Baykeeper*: cover or contain the piles. *Id.* at 1159. It is not obvious that stormwater discharges from a high-speed rail construction site are a similarly simple problem. How much rain was necessary over what period before there was a problem? How often did rain fall in that volume and at that rate? What pollutants did the water reach, where, and how much did it carry? What precautions did the Authority date, how did the contaminated water escape those precautions, and where did it flow? And what additional precautions would have avoided which discharges?

Although these uncertainties may seem like enough to separate this case from BayKeepers, a second Ninth Circuit opinion issued just two years later compels the conclusion that any differences are not legally meaningful. *See Waterkeepers Northern California v. AG Industrial Manufacturing, Inc.,* 375 F.3d 913, 917–18 & n.2 (9th Cir. 2004). The plaintiff in *Waterkeepers*, like Center Point, charged the defendant with violations of the Clean Water Act based on allegations about polluted stormwater discharges. *See id.* at 915. Its pre-suit notice letter "described the problem of storm water pollution" in a nearby river, identified pollutants "associated with" the defendant's operations, described their sources and the practices "that led to the discharge of contaminated storm water" from the defendant's site, and accused the defendant of violating the Clean Water Act by discharging contaminated storm water "during at least every rain event over 0.1 inches." *Id.* at 917. The letter then suggested solutions for the problem, such as grading, berms, roofing, and a filtration system. *Id.*

The district court dismissed the plaintiff's claims. In its view, the letter "did not provide

enough specific information about the dates of the alleged storm-water discharges." *Id.* The Circuit disagreed. In its view, *BayKeeper* was controlling. *See id.* The Circuit specifically rejected the district court's concern that unlike "the piles of petroleum coke" that "were so readily identifiable" in *Baykeeper*, "the nature of the potential remedial actions to be taken" in *Waterkeepers* was less clear. *Id.* at 918 n.2. It was true that no single source could be blamed for all of the defendant's allegedly contaminated discharges, but its pollution problem was as easy to understand as the petroleum coke dealer's alleged violation. Its property was "allegedly littered with contaminants, and those contaminants [were] carried off the site when it rains." *Id.*

By this reasoning, it would have been enough for Center Point to write in its notice letter that there was an illegal discharge of polluted stormwater every time it rained enough to cause stormwater discharges from the Authority's property. That statement is no less specific than "coke blew off the pile every time the wind was strong enough to blow coke off the pile." Center Point's notice letter was adequate with respect to its claims about past discharges of polluted stormwater onto its land from the High-Speed Rail Authority's property.

Choudri argues otherwise, citing the more specific allegation in *Waterkeepers* about rain events over 0.1 inches. (Doc. 17-1 at 17.) But he does not explain why more specific information about historical rainfall events would have helped the High-Speed Rail Authority understand Center Point's allegations or give the Authority an "opportunity to correct the problem." *Cottonwood*, 86 F.4th at 1264 (quoting *BayKeeper*, 309 F.3d at 1158).

Choudri also argues Center Point's notice is more like the notice the plaintiff gave in *Center for Biological Diversity* than those in *Baykeeper* or *Waterkeepers*. (*See, e.g.*, Doc. 17-1 at 17.) It is true, as Choudri points out, that the notices in *Center for Biological Diversity* omitted specific dates, just like Center Point's notice. *See* 566 F.3d at 803. But that omission was just one of many problems that deprived the district court of jurisdiction. As summarized above, the notices in *Center for Biological Diversity* also failed to cite one of the statutes the plaintiffs later attempted to rely on in their complaint, and although the notices asserted that the defendant had harmed "wetlands," they "did not give any detail whatsoever regarding what wetlands were allegedly being affect or how." *Id.* at 802–03 (quotation marks omitted). But perhaps most

importantly, after the plaintiffs sent those notices—but before they filed their lawsuit—the Army Corps of Engineers "stepped in to obviate and ameliorate any problems." *Id.* at 803. So even if the notices "were insufficient at their inception, . . . their efficacy was limited" by the government's own enforcement efforts. *See id.* at 803–04. Center Point did not send its notice in comparable circumstances.

In sum, Center Point's notice letter adequately presented its claims about ongoing permit violations, procedural irregularities, and stormwater discharges onto its own property. The notice did not give adequate notice of potential claims about violations at "other sites," nor any potential claims against Choudri in his individual or personal capacity.

**STANDING**

Choudri next argues Center Point lacks standing under Article III of the U.S. Constitution. (*See* Doc. 17-1 at 17–22.) "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs.* (*TOC*), *Inc.*, 528 U.S. 167, 180–81 (2000) (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992)). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Id.* at 185.

Choudri divides his standing arguments into two parts. He first addresses Center Point's allegation that polluted stormwater has been discharged onto its land from the nearby high-speed rail project. (*See* Doc. 17-1 at 18–20.) In his view, Center Point has no standing to pursue these allegations because it cannot prove that the harms in question can be traced to any violations of the Clean Water Act, nor that the High-Speed Rail Authority's compliance with the Clean Water Act would prevent those harms. (*See id.*) The Clean Water Act, he explains, does not prohibit the unpermitted discharge of pollutants generally, but rather only discharges into "the waters of the United States." (*See id.* at 18 (citing *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 671–72 (2023)).) So in Choudri's view, if Center Point cannot tie its injury or its requests for relief to any discharges into the "waters of the United States," then its allegations about polluted discharges

give it no standing to sue. (*See id.* at 18–19.)

Center Point argues correctly in its opposition that constitutional standing is not about whether a defendant violated the law, nor whether a plaintiff's injuries can be attributed to a violation of a particular statute. (*See* Doc. 19 at 24–26.) In citizen-enforcement cases like this one, as in other cases, "jurisdiction is not defeated by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (other alterations omitted) (quoting *Bell. v. Hood*, 327 U.S. 678, 685 (1946)). In other words, "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the courts' statutory or constitutional power to adjudicate the case." *Id.* (emphasis omitted). To be sure, if a claim is "wholly insubstantial, "frivolous," or "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction," then the Court may lack jurisdiction to hear it. *Id.* (quoting *Bell*, 327 U.S. at 382–83). But Choudri does not argue and has not demonstrated that Center Point's claims fall short of this lower bar.

Center Point's allegations about polluted stormwater discharges give it standing under Article III. First, it alleges that it uses its land for "agricultural purposes," and it alleges that larger and more "severe" discharges of polluted stormwater onto its land have reduced the land's value and have interfered with its "agricultural production." (*See, e.g.*, Doc. 16 at 3, 4–5); *see also, e.g.*, *Friends of the Earth*, 504 U.S. at 181 (holding that in a citizen suit under the Clean Water Act, "[t]he relevant showing for Article III standing is not injury to the environment but injury to the plaintiff."). Second, Center Point alleges that the High-Speed Rail Authority's actions at Choudri's direction are causing larger and more severe discharges. (*See, e.g.*, Doc. 16 at 3–4, 11–12, 13–14.) Third, in Center Point's telling, harmful discharges are likely to be smaller or less severe if the High-Speed Rail Authority were compelled to comply with certain permitting requirements, such as constructing and maintaining ditches and berms, as Center Point requests in its prayer for relief. (*See id.* at 14, 19.)

Because Choudri is not attempting to prove that these allegations are false at the moment (*see* Doc. 20 at 6–7), Center Point can rely on them to establish its standing, *see Lujan*, 504 U.S.

at 561; *see also, e.g.*, *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (distinguishing facial from factual attacks on jurisdiction). Center Point's allegations about polluted stormwater discharges are "a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Central Delta Water Agency v. United States*, 306 F.3d 938, 946 (2002) (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982)). The Court has jurisdiction to hear those claims to relief.

Choudri next argues Center Point does not have standing to pursue relief tied to any "procedural violations," such as failures to fulfill various "reporting, monitoring, and record-keeping obligations." (Doc. 17-1 at 20–23.) By his reading, the complaint does not allege that these violations actually caused any injury. Center Point contends in opposition that it "could use the Authority's monitoring and reporting information to evaluate the nature and extent of pollutants being deposited" into various water bodies that it "relies on for irrigation" and to assess the effect of these deposits "on Center Point's agricultural operations," citing paragraphs fourteen and fifteen of its complaint. (Doc. 19 at 26 n.13.)

Those paragraphs do not include allegations that would support these arguments. In paragraph 14, Center Point alleges the Authority's actions are causing polluted stormwater to be discharged into the waters of the United States. (Doc. 16 at 5.) In paragraph 15, Center Point alleges without elaboration that the Authority's actions have deprived it "of relevant and important information to reduce the risk of economic injury." (*Id.*) Center Point's other allegations are similarly generic. (*See, e.g.*, *id.* at 12 ("The Authority's failure to develop and/or implement an adequate and effective Construction Stormwater Monitoring Program for all areas of the Project Site in accordance with the requirements of the Construction General Permit has caused, and will continue to cause, an increased volume of stormwater and pollutants being discharged from the Project Site onto the Affected Properties resulting in flooding and other adverse impacts to Center Point's injury.")).)

It is true that a "variety of alleged procedural injuries" can show that a district court has jurisdiction to hear claims under the Clean Water Act and other similar laws. *Nw. Env't Advocs.*

*v. U.S. Dep't of Com.*, 322 F. Supp. 3d 1093, 1098 (W.D. Wash. 2018) (collecting authority). But "[a] procedural injury in and of itself is not sufficient unless there is a concrete harm associated with the procedural injury." *Nevada Irrigation Dist. v. Sobeck*, 705 F. Supp. 3d 1093, 1104 (E.D. Cal. 2023). Plaintiffs in Clean Water Act cases "may not rely on 'the remote possibility, unsubstantiated by allegations of fact, that their situations might have been better had respondents acted otherwise, and might improve were the court to afford relief.'" *Gonzales v. Gorsuch*, 688 F.2d 1263, 1268 (9th Cir. 1982) (quoting *Bowker v. Morton*, 541 F.2d 1347, 1349 (9th Cir. 1976)).

By way of example, Choudri cites another recent Clean Water Act case in this District. (*See* Doc. 17-1 at 14–15 (citing *Central Valley Eden Envt'l Defs., LLC v. Champion Home Builders, Inc.*, No. 23-01273, 2024 WL 115386 (E.D. Cal. Jan. 10, 2024)).) Like Center Point, the plaintiff in *Central Valley Eden* alleged that the defendants had not monitored their stormwater discharges or reported information in compliance with their permit. *See* 2024 WL 115386, at *5. And like Center Point, the plaintiff in *Central Valley Eden* did not explain its "intended use for this information." *Id.* Without that explanation, the complaint was "nothing more than a generalized grievance" that a federal district court cannot hear. *Id.* Center Point has similarly offered no factual allegations that, if proven, would show the High-Speed Rail Authority's failure to live up to its reporting, monitoring, and record-keeping obligations caused any concrete harm. The motion to dismiss these procedural claims is granted.

**ELEVENTH AMENDMENT**

Choudri advances one last jurisdictional argument: that the Eleventh Amendment deprives this Court of jurisdiction over Center Point's request for civil penalties. (Doc. 17-1 at 26–29.) The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Supreme Court has long interpreted this language as barring cases "by citizens and noncitizens alike." *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1025 (9th Cir. 2023) (en banc) (collecting authority). It has also "long been settled" that the Eleventh Amendment bars "certain actions

against state agents and state instrumentalities." *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429 (1997). In *Kohn*, for example, the Ninth Circuit recently reaffirmed en banc that the California State Bar is an "arm of the state" that "enjoys Eleventh Amendment protection in federal court." 87 F.4th at 1023.

A plaintiff can, however, sue "state officers in their official capacities for prospective declaratory or injunctive relief for their alleged violations of federal law." *Forward, Inc. v. Macomber*, 178 F.4th 470, 473 (9th Cir. 2026) (citing *Ex parte Young*, 209 U.S. 123 (1908) and quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013)). A district court can "order prospective relief as well as measures ancillary to appropriate prospective relief." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citations omitted). But it "may not award retroactive relief that requires the payment of funds from the state treasury." *Nat. Res. Def. Council v. California Dep't of Transp.*, 96 F.3d 420, 422 (9th Cir. 1996) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984) and *Quern v. Jordan*, 440 U.S. 332, 337 (1979)); *accord Frew*, 540 U.S. at 437 ("Federal courts may not award retrospective relief, for instance, money damages or its equivalent, if the State invokes its immunity.").

Choudri contends that the High-Speed Rail Authority is an arm of the state. (*See* Docs. 17-1 at 27; 20 at 13–15.) If that is correct, then this Court could hear a request for prospective declaratory or injunctive relief against him in his official capacity but not a request for civil penalties. *See, e.g.*, *Nat. Res. Def. Council*, 96 F.3d at 423 (affirming dismissal of official-capacity claims for civil penalties under the Clean Water Act against the director of the California Department of Transportation, an arm of the state). Center Point argues in opposition that the High-Speed Rail Authority is not an arm of the state, which would mean that the Authority cannot rely on the Eleventh Amendment. (*See* Doc. 19 at 29–31.) The parties have not identified any cases in which any courts have decided whether the High-Speed Rail Authority is an arm of the state for purposes of the Eleventh Amendment, and this Court's own searches have yielded none.

It can sometimes be relatively simple to see why a particular entity is an arm of the state. *See, e.g.*, *Greater L.A. Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1110, 1114 (9th Cir.

1987) (holding in a short paragraph that the California Superior Court is an arm of the state). This is not such a case. The construction of a railroad is not an obvious function of a state government. In the first half of the twentieth century, private entities commonly operated passenger rail and mass transit systems in the United States. *Kramer v. New Castle Area Transit Auth.*, 677 F.2d 308, 309 (3d Cir. 1982). And although government entities commonly construct and operate mass transit networks today, those entities can be state, local, and municipal entities. *See, e.g.*, *Amalgamated Transit Union, Int'l v. United States Dep't of Lab.*, No. 20-00953, 2021 WL 6002212, at *1–6 (E.D. Cal. Dec. 20, 2021) (summarizing litigation about federal funding for mass transit operated by both state and municipal government entities). On the other hand, states have sometimes constructed and operated other similarly large-scale transportation projects, such as California's highway system. *See, e.g.*, Cal. Pub. Util. Code § 185010(a), (h).

Given this uncertain context, the Court must rely on the "three-factor test" the Ninth Circuit set up in *Kohn*: "(1) the state's intent as to the status of the entity, including the functions performed by the entity; (2) the state's control over the entity; and (3) the entity's overall effects on the state treasury." *Id.* at 1030 (alterations omitted) (quoting *P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 874 (D.C. Cir. 2008)).

**I. Intent**

Several different types of evidence can shed light on a state's intent, including "whether state law expressly characterizes the entity as a governmental instrumentality rather than as a local governmental or non-governmental entity; whether the entity performs state governmental functions; whether the entity is treated as a governmental instrumentality for purposes of other state law; and state representations about the entity's status," *id.*, such as any characterizations by the state's legislature and courts, *see id.* at 1032–33, or any state laws that treat the entity like other government instrumentalities, *see id.* at 1034.

Choudri has cited several relevant expressions of intent. First and foremost, the statute that originally created the High-Speed Rail Authority refers to the Authority as part of the state government. *See* Cal. Pub. Util. Code § 185020(a) (1996) ("There is in state government a High-Speed Rail Authority consisting of nine members."). And when the state reorganized its agencies

in 2012, it made the Authority part of its "Transportation Agency" within the "state government." *See* Cal. Gov't Code § 13975 ("There is in the state government the Transportation Agency. The agency consists of the Department of the California Highway Patrol, the California Transportation Commission, the Department of Motor Vehicles, the Department of Transportation, the High-Speed Rail Authority, and the Board of Pilot Commissioners for the Bays of San Francisco, San Pablo, and Suisun."); Cal. Pub. Util. Code § 185020(a) ("There is in the Transportation Agency a High-Speed Rail Authority.").

The State's Public Utilities Code also includes several findings to suggest the Authority is a state endeavor. *See, e.g.*, Cal. Pub. Util. Code § 185010(g) ("Development of a high-speed rail system is a necessary and viable alternative to automobile and air travel in the state."); *id.* § 185010(h) ("In order for the state to have a comprehensive network of high-speed intercity rail systems by the year 2020, it must begin preparation of a high-speed intercity rail plan similar to California's former freeway plan and designate an entity with stable and predictable funding sources to implement the plan."); *id.* § 185010(j) ("Upon confirmation of the need and costs by detailed studies, the private sector, together with the state, can build and operate new high-speed intercity rail systems utilizing private and public financing."); § 185032 (requiring the Agency to "prepare a plan for the construction and operation of a high-speed train network for the state.").

Next, as Choudri points out, at least two California appellate courts appear to have accepted the premise that the Authority is a state entity. *See Town of Atherton v. Cal. High-Speed Rail Auth.*, 228 Cal. App. 4th 314, 339, 340 (2014) ("This case is unusual to say the least; the state entity, represented by the state's Attorney General, is inexplicably arguing for federal preemption instead of defending the application of state law. . . . The Authority offers no direct authority for its proposition that only a state entity can invoke the market participation doctrine."); *Cal. High-Speed Rail Auth. v. Superior Ct.*, 228 Cal. App. 4th 676, 685 (2014) (describing the law that created the HSRA as "incorporating by reference the State General Obligation Bond law, . . . which provides a uniform procedure for authorizing the issuance, sale, and repayment of general obligation bonds on behalf of the State."). Centerpoint has even described the High-Speed Rail Authority as a "state agency" in its complaints in the state court

case and this case. (Docs. 16 at 3; 17-3 at 14.)

Center Point argues the Authority is not an arm of the state because California law does not treat it like other state agencies. (*See* Doc. 19 at 30.) It cites statutes that create rules for what should happen when a utility and the Authority have disputes about their obligations or costs under a contract to remove or relocate a utility facility. (*See id.* (citing Cal. Pub. Util. Code § 185505–185506)).) Under these provisions, the ordinary claim presentation requirements do not apply to claims by the utility. *See* Cal. Pub. Util. Code § 185505 ("Either party may maintain an action in a court of competent jurisdiction for an adjudication as to the obligations and costs to be borne by each party under any contract . . . . The filing of a claim with a state agency shall not be deemed a condition precedent to the maintenance by the utility of an action under this subdivision."); *id.* § 185506 ("[T]he utility or the authority may bring an action in a court of competent jurisdiction for apportionment of the cost between them in accordance with this chapter. . . . The filing of a claim with a state agency shall not be deemed a condition precedent to the maintenance by the utility of an action pursuant to this section.").

In a similar vein, Center Point cites a state statute that makes an exception to the state's ordinary venue rules. (*See* Doc. 19 at 30.) Actions against the High-Speed Rail Authority must be "brought in a court of competent jurisdiction in the County of Sacramento," contrary to section 401(1) of the state's Code of Civil Procedure, which permits actions "in any city and county . . . in which the Attorney General has an office." Cal. Pub. Util. Code § 185038; *see also* Cal. Civ. P. Code 401(1) ("Whenever it is provided by any law of this State that an action or proceeding against the State or a department, institution, board, commission, bureau, officer or other agency thereof shall or may be commenced in, tried in, or removed to the County of Sacramento, the same may be commenced and tried in any city or city and county of this State in which the Attorney General has an office.").

These narrow exceptions to the ordinary rules do not conflict with the notion that the Authority was intended to be a state agency. First, stricter venue limits suggest the Authority is a state entity. Second, the legislature's decision to change the state's ordinary claim-presentation rules might simply be in recognition of the unusual contractual relationships that various utilities

might have with the Authority. In any event, these limited exceptions do not outweigh the clear expressions of intent cited above.

Finally, Center Point emphasizes that the Authority is represented by private counsel in this case, even though the Attorney General is normally obligated to defend state officers sued in their official capacity. *See* Cal. Gov't Code § 12512 ("The Attorney General shall attend the Supreme Court and prosecute or defend all causes to which the state, or any state officer, is a party in the state officer's official capacity."). The Authority's decision to retain private counsel does not obviously conflict with the notion that it is an arm of the state. *Cf., e.g.*, *Coleman v. Newsom*, 131 F.4th 948, 953–55 (9th Cir. 2025) (summarizing the history of a long-running action in which several state officers, including the governor of California and the Secretary of the Department of Corrections and Rehabilitation, are represented in part by private counsel).

The first of the three relevant factors therefore weighs heavily in favor of the conclusion that the Authority is an arm of the state.

**II. Control**

The second factor in the test, state control, "depends on how members of the governing body of the entity are appointed and removed, as well as whether the state can 'directly supervise and control [the entity's] ongoing operations.'" *Kohn*, 87 F.4th at 1030 (quoting *P.R. Ports Auth.*, 531 F.3d at 877). If state entities appoint the entity's officers and director, then this factor favors immunity. *See id.* at 1035. Other types of control can also be relevant, depending on the context. *See id.* (considering supervision of state bar by state supreme court).

State actors exercise significant control over the High-Speed Rail Authority's leadership. The Authority has eleven members. Cal. Pub. Util. Code § 185020(b)(1). They are appointed by the governor and officials within the state legislature, *see id.*, and they are "subject to the Political Reform Act of 1974," *id.* § 185020(e). The Authority's Chief Executive Officer is appointed by the board. *See id.* § 185024(a) ("The authority shall appoint an executive director, exempt from civil service, who shall serve at the pleasure of the authority, to administer the affairs of the authority as directed by the authority."). The governor can appoint other inferior officers. *See* Cal. Pub. Util. Code § 185024(b) ("[T]he Governor, upon the recommendation of the executive

director, may appoint up to six additional individuals, exempt from civil service . . . : (1) Chief program manager. (2) Up to three regional directors. (3) Chief financial officer. (4) Director of risk management and project controls."). Although the governor appoints these officers, and although the state's Department of Human Resources approves their compensation, they "serve at the pleasure of the executive director." *Id.*; *see also id.* § 185020(c).

State actors also supervise many significant parts of the Authority's work. For example, the Authority must by statute "prepare, publish, adopt, and submit to the Legislature, not later than May 1, 2014, and every two years thereafter, a business plan." Cal. Pub. Util. Code § 185033(a). State law also limits the Authority's autonomy by permitting it to take some actions only with "approval by the Legislature, by the enactment of a statute, or by approval by the votes of a financial plan," such as entering "contracts for the design, construction, and operation of high-speed trains"; "[a]cquir[ing] rights-of-way through purchase or eminent domain"; "[i]ssu[ing] debt"; "[e]nter[ing] into cooperative or joint development agreements with local governments or private entities"; and "[r]elocat[ing] highways and utilities." *Id.* § 185036.

California law does give the Authority the power to do many things without the state legislature's or governor's approval, but these are relatively less consequential tasks, such as the power to conduct studies; evaluate train technology; "accept grants, fees, and allocations from the state, from political subdivisions of the state or from the federal government, foreign officials, and private sources"; to keep the public informed, and to "[d]evelop a proposed high-speed rail financial plan, including necessary taxes, bonds, or both, or other indebtedness, and submit the plan to the Legislature and to the Governor." Cal Pub. Util. Code § 185034(8) (emphasis added).

Finally, as Choudri notes, a California Appellate Court has interpreted a state-wide 2008 ballot proposition about high-speed rail funding as "part of a comprehensive legislative scheme" that puts the state legislature in control. *Cal. High-Speed Rail Auth. v. Superior Cout*, 228 Cal. App. 4th 676, 686 n.4 (2014). The legislature is also involved at multiple points of the planning and funding process. *See id.* at 684–90 (reviewing the relevant statutes in detail).

These multiple indicators of state control show that this factor weighs heavily in favor of the conclusion that the Authority is an arm of the state.

**III. Treasury**

"In analyzing this third factor the relevant issue is a state's overall responsibility for funding the entity or paying the entity's debts or judgments, not whether the state would be responsible to pay a judgment in the particular case at issue." *Kohn*, 87 F.4th at 1036 (alterations and emphasis omitted) (quoting *P.A. Ports Auth.*, 531 F.3d at 878).

The Authority's funding sources are somewhat mixed, but state money makes up a significant portion of the Authority's financial resources. According to a publicly available report that the parties cite, "the Authority targeted up to 50 percent of project funding coming from federal government" in 2008 when voters approved a relevant ballot proposition, but "for this project the state has appropriated approximately 75 percent of current funding." (Doc. 19-2 at 305.) These funds come from bonds appropriated by the legislature and the state's cap and trade program. (*See id.* at 304); *see also Cal. High-Speed Rail Auth. v. Superior Court*, 228 Cal. App. 4th 676, 692 (2014) ("[I]n 2012 the Legislature appropriated a total of $4,732,582,000 in Bond Act funds and $3,289,030,000 from the Federal Trust Fund to finance high-speed rail in California."). The report also states that the "General Fund supports bond debt service on general obligations bonds . . . , but does not currently provide any direct funding for the project." (Doc. 19-2 at 304.)

Center Point emphasizes the Authority's statutory authority to dispose of real property. The provisions it cites do not support the conclusion that the Authority is independent of the state. Under one of them, "[i]f the authority determines that real property or an interest therein, previously or hereafter acquired by the state for high-speed rail purposes, is no longer necessary for those purposes, the authority may sell or exchange the real property or interest therein at fair market value in the manner set forth in this section." Cal. Pub. Util. Code § 185040(a). The payments it receives "shall be deposited in the High-Speed Rail Property Fund created pursuant to Section 185045 and shall be available to the authority upon appropriation as provided in that section." *Id.* § 185040(h). The Legislature created that fund "in the State Treasury." *Id.* § 185045. "Revenues in the fund shall be available to the authority, upon appropriation by the Legislature, for use in the development, improvement, and maintenance of the high-speed rail

system, consistent with appropriate uses for each funding source." *Id.* § 185045. The state accordingly is directly involved in this type of funding.

Under another similar provision, the High-Speed Rail Authority has statutory power to "sell or lease excess right-of-way parcels to municipalities or other local agencies for public purposes." *Id.* § 185041. It "may accept as all or part of the consideration for the sale or lease any substantial benefits the state will derive from the municipality or other local agency's undertaking maintenance or landscaping costs that would otherwise be the obligation of the state." *Id.*; *see also id.* § 185042 (making similar provisions for "nonoperating right-of-way areas"); *id.* § 158044 (provisions related to leases of "areas above or below operating rights-of-way and portions of property not currently being used as operating rights-of-way," which "shall be deposited in the High-Speed Rail Property Fund"). These references to "public purposes," "benefits the state will derive," "costs that would otherwise be the obligation of the state," and the state's property fund suggest again that the state is involved in this type of funding.

All three factors therefore point to the same answer: the High-Speed Rail Authority is an arm of the state. Center Point cannot pursue a claim for civil penalties. *See, e.g.*, *Nat. Res. Def. Council*, 96 F.3d at 423.

## STATING A CLAIM FOR RELIEF

To summarize, Center Point has demonstrated that this Court has subject matter jurisdiction over one of its claims against Choudri in his official capacity, i.e., that the High-Speed Rail Authority is violating the Clean Water Act by discharging polluted stormwater onto Center Point's land. It gave adequate pre-suit notice of that claim, it has constitutional standing to pursue a claim based on harmful stormwater discharges under Article III, and it can pursue prospective injunctive or declaratory relief under *Ex Parte Young*. The Court therefore has jurisdiction over Choudri's motion to dismiss this claim on its merits under Federal Rule of Civil Procedure 12(b)(6). (*See* Doc. 17-1 at 22–26.)

Rule 12(b)(6) permits motions to dismiss for "failure to state a claim upon which relief can be granted." A Rule 12(b)(6) motion tests a complaint's "legal sufficiency," *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001), that is, whether it is based on "a cognizable legal

theory" and includes "sufficient facts" to support that theory, *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). The district court's task is to decide whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Choudri argues among other things that Center Point's complaint is too sparse on factual allegations about the allegedly unlawful discharges. (*See* Doc. 17-1 at 25–26.) He contends accurately in his opening brief that the complaint does not explain what pollutants are likely to be discharged in the future or have already been discharged in the past. (*See id.*) He is also right to point out that the complaint does not explain where water was discharged and how any of the allegedly unlawful discharges make their way to the waters of the United States. (*See id.*) Center Point alleges only generically that polluted water will reach "the Fresno River, Cottonwood Creek, and the San Joaquin River," as well as "the San Joaquin Valley Groundwater Basin," which it asserts—again without explanation—is "the functional equivalent" of a discharge into the waters of the United States. (Doc. 16 at 5, 8.)

Center Point does not cite relevant factual allegations in its opposition. (*See* Doc. 19 at 28–29.) Just the opposite: it argues that it cannot be expected to offer more specific information, and it lays the blame with the High-Speed Rail Authority. (*See id.*) It argues the Authority should have monitored its discharges and disclosed more information. (*See id.*) This position is difficult to square with Center Point's own allegation that polluted stormwater has been flowing into its land for many years. (*See* Doc. 20 at 12–13.) It also runs afoul of the Supreme Court's instructions about a plaintiff's obligations under Federal Rule of Civil Procedure 8. *See Iqbal*, 556 U.S. at 678–79.

Center Point requests leave to amend. (*See* Doc. 19 at 33.) The Court perceives no undue delay, bad faith, or prejudice in this request, and it is not clear that any amendment would be futile. It is true, as Choudri points out, that the Ninth Circuit has interpreted the Clean Water Act's citizen suit provision as part of an effort "to ensure that an interest in the environment and clean water, whether or not economically based," can be presented in a federal district court. *Dan*

*Caputo Co. v. Russian River Cnty. Sanitation Dist.*, 749 F.2d 571, 575 (9th Cir. 1984) (quoting *Gonzales v. Gorsuch*, 688 F.2d 1263, 1268 (9th Cir. 1982)). The Circuit has therefore held that if a plaintiff's claim does not "arise from an interest in the environment" and does not "seek to vindicate environmental concerns," then that claim does not fall within the relevant zone of interests. *Id.* It may be true, as Choudri argues, that Center Point cannot assert this type of interest, but that is not such an obvious fact that an amendment would be an exercise in futility. With that said, any further amended complaint must include allegations to show that Center Point can rely on an interest within the relevant statutory "zone."

**CONCLUSION**

In conclusion, the motion to dismiss is **GRANTED** for the reasons above. Center Point's request for leave to amend is **GRANTED IN PART**:

- The Court will not permit amendments related to violations at "other sites," nor any potential claims against Choudri in his individual or personal capacity. These claims are dismissed for lack of adequate pre-suit notice, and no amendment could give pre-suit notice retroactively.
- Center Point's claims about past and ongoing procedural violations are dismissed with leave to amend. Any further amended complaint must include factual allegations showing that Center Point has standing to pursue these claims. *See Central Valley Eden*, 2024 WL 115386, at *6 (permitting an amendment in a similar case).
- Center Point's claim for civil penalties is dismissed without leave to amend. An amendment would be futile, given the High-Speed Rail Authority's status as an arm of the state.
- Center Point's claims about discharges of polluted stormwater onto its land are dismissed with leave to amend, as explained in the previous section.

///

///

///

Any further amended complaint must be filed within thirty days. Failure to file an amended complaint will result in the Court dismissing the action.

IT IS SO ORDERED.

Dated: _August 13, 2026_

Jennifer L. Thurston
UNITED STATES DISTRICT JUDGE