**WANGER JONES HELSLEY PC**
265 East River Park Circle, Suite 310
Fresno, California 93720
Telephone: (559) 233-4800
Facsimile: (559) 233-9330

Jay A. Christofferson #203878
jchristofferson@wjhattorneys.com
Nicolas R. Cardella #304151
ncardella@wjhattorneys.com
Danika E. Jones #353955
djones@wjhattorneys.com

Attorneys for: Plaintiff CENTER POINT, LLC

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CENTER POINT, LLC<br><br>Plaintiff,<br><br>v.<br><br>IAN CHOUDRI, in his official capacity as Chief Executive Officer of the California High-Speed Rail Authority; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. 1:24−CV−01600−JLT−EPG<br><br>**THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**I.**

**JURISDICTION AND VENUE**

1. This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. ("Clean Water Act," "Act," or "CWA"). See 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331, 1367, and 2201.

2. Center Point served a 60-day notice letter ("Notice Letter") on the California High-Speed Rail Authority, its Board of Directors, and its Chief Executive Officer (collectively herein, "Authority" or "Discharger") via certified mail postmarked October 29, 2024. The Notice Letter identified numerous continuous and ongoing violations of the Act and included sufficient information to permit the Authority to identify the specific requirements alleged to have been violated, the activities alleged to constitute a violation, the persons responsible for the alleged violations, the locations of the alleged violations, and the dates of the alleged violations. Copies of the Notice Letter were also sent to the Administrator of the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA for Region 9, the Executive Director of the California State Water Resources Control Board, and the Executive Directors of the nine Regional Water Quality Control Boards. A copy of the Notice Letter is attached as Exhibit A and is incorporated herein by this reference.

3. More than sixty (60) days have passed since the Notice Letter was served on the appropriate parties.

4. Center Point is informed and believes, and based thereon alleges, that as of the date of filing, the Authority has not rectified any of the violations set forth in the Notice Letter.

5. Center Point is informed and believes, and thereon alleges, that no government agency has commenced, and is diligently prosecuting, any action to redress the violations alleged in the Notice Letter and in this complaint, and that no claim in this action is barred by any prior administrative action under 33 U.S.C. § 1319(g).

6. Venue is proper in the Eastern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

///

## II.

## PARTIES

7. Defendant Ian Choudri ("Mr. Choudri") is the Chief Executive Officer ("CEO") of the California High-Speed Rail Authority, a California state agency established pursuant to the California Public Utilities Code § 185000, et seq. and is responsible for planning, designing, building, and operating the California High-Speed Train Project ("Project"). Mr. Choudri is sued in his official capacity as the Authority's CEO. Mr. Choudri, in his official capacity as the Authority's CEO is responsible for administering the Authority's affairs and is responsible for the unlawful acts and omissions alleged herein, see Cal. Pub. Util. Code, § 185024.

8. Plaintiff Center Point LLC ("Center Point" or "Plaintiff") is and at all relevant times mentioned herein was a California limited liability company doing business in the County of Madera, California. Center Point owns real property between Avenue 10 and Avenue 12 that is within and/or adjacent to the construction corridor for the initial Merced to Fresno section of the Project known as California High-Speed Train Construction Package 1 ("Affected Property"). Plaintiff uses the Affected Property for agricultural uses, including the growing of permanent row crops. Plaintiff relies primarily on groundwater to irrigate its crops but also uses surface water when available to make proper use of its property.

9. Center Point is informed and believes, and on that basis alleges herein, that Mr. Choudri, in his official capacity as CEO of the Authority, has caused, allowed, ratified, and/or failed to correct ongoing violations of the Clean Water Act as alleged herein and that such conduct by Mr. Choudri in his official capacity has caused, and will continue to cause, injury to Center Point, and others, unless and until relief is granted as requested herein.

10. The true names and capacities of the parties fictitiously identified as Does 1 through 100 are unknown to Plaintiff, and therefore Plaintiff sues them by fictitious names. Plaintiff is informed and believe, and on that basis alleges, that the Authority, Mr. Choudri, and Does 1 through 100, inclusive, and each of them, are in some manner responsible for the acts and omissions alleged herein. Whenever the terms "Authority," "Mr. Choudri," "Discharger," or "Defendants" are used herein, said terms shall be construed as including Does 1 through 100, inclusive. Plaintiff will amend this Complaint to show

the true names and capacities of Does 1 through 100 when the same are ascertained, as well as the manner in which each is responsible.

11. The Authority's continuous and ongoing failure to comply with the Act in connection with the Project has caused, and will continue to cause, polluted stormwater being discharged onto the Affected Property and into the groundwater aquifer, and has caused or threatened to cause, and will continue to cause or threaten to cause, polluted stormwater being discharged into WOTUS, including the Receiving Waters.

12. The Authority's ongoing failure to comply with the Act as alleged herein is adversely affecting Center Point and causing it actual harm, including without limitation by increasing the volume and/or severity of discharges onto the Affected Property, discharging pollutants onto the Affected Property, and polluting groundwater in and around the Affected Property, thereby interfering with Center Point's ability to use the Affected Property for agricultural and other uses. The Authority's ongoing failure to comply with the Act as alleged herein is also causing, or threatening to cause, injury to WOTUS, including the Receiving Waters, in the form of increased discharge of pollutants into such waters. The increased volume and/or severity of discharges onto the Affected Property, and discharge of pollutants onto the Affected Property have directly interfered with and prevented Center Point's ability to use the Affected Property for agricultural purposes and have caused, *inter alia*, a reduction in property value and agricultural production, which constitute direct and substantial harm to Center Point's interests.

13. Center Point brings this action to vindicate its interest in the environment and in clean water. Center Point's injuries arise directly from environmental harm—the discharge of polluted stormwater and pollutants onto its land, into the groundwater aquifer on which it relies, and into the Receiving Waters—and through this action Center Point seeks to abate that pollution and to protect and restore the quality of the surface water and groundwater on and around the Affected Property. Center Point's interest is therefore an interest in the environment and clean water, whether or not it is also economically based.

14. Center Point is further informed and believes, and therefore alleges that the Authority's continuous and ongoing failure to comply with the Act causes or threatens to cause, and will continue

to cause or threaten to cause, polluted stormwater to be discharged into WOTUS, including the Receiving Waters because the Authority's discharges into groundwater are the functional equivalent of a direct discharge into WOTUS. *See Cty of Maui v. Haw. Wildlife Fund* (2020) 590 U.S. 165, 183–184.

a. The Authority's own Storm Water Pollution Prevention Plan acknowledges that Construction Package 1 drains directly into WOTUS, including the segment that runs through the Affected Property, and the segment through the Affected Property is classified as Risk Level 2, reflecting a significant risk to receiving water quality.

b. Additionally, the groundwater beneath and around the Affected Property is hydraulically connected to the interconnected surface waters of the region, such that pollutants entering the groundwater can reach those surface waters. The San Joaquin Valley Groundwater Basin underlying and downgradient of the Affected Property is an alluvial aquifer system of the type formed by stream-deposited sand and gravel interspersed with fine-grained sediments. Depth to groundwater in these areas is low and soil permeability is high relative to other areas of Construction Package 1 within the San Joaquin Valley Groundwater Basin, as they are located near active stream channels, including Cottonwood Creek (approximately 1.75 miles), the Fresno River (approximately 5 miles), and the San Joaquin River (approximately 6 miles). As a result, the aquifer can and does transmit the pollutants with limited dilution or chemical change such that a substantial portion of the pollutants that enter the groundwater ultimately reach Cottonwood Creek, the Fresno River, and/or the San Joaquin River. The Authority's discharges into groundwater are therefore the functional equivalent of a direct discharge into WOTUS.

15. Moreover, the Authority's ongoing failure to comply with the Act, including its failure to fulfill its reporting, monitoring, sampling, and record-keeping obligations under the Construction General Permit as alleged herein, causes and continues to cause concrete and particularized harm to Center Point.

a. Center Point uses the Affected Property to grow permanent row crops, namely the almond orchards referred to herein as Ranch 10 and Ranch 11, which it irrigates principally with groundwater drawn from its on-site wells through a drip and micro-sprinkler irrigation system, as well as surface water when available.

b. The sampling, monitoring, and reporting data that the Construction General Permit requires the Authority to collect, analyze, and upload to SMARTS—including pH, turbidity, and non-visible-pollutant sampling results from qualifying storm events—is the primary means by which Center Point can identify the specific pollutants, concentrations, and volumes being discharged onto and across the Affected Property and into the groundwater aquifer that Center Point pumps through its on-site wells to irrigate Ranch 10 and Ranch 11. Center Point intends to use that information to determine whether the well water it applies to its food crops must be tested, blended, or treated before application, and to decide whether particular orchard blocks must be fallowed, replanted, or remediated.

c. Because the Authority has failed to generate, maintain, and disclose this information, Center Point has been deprived of the ability to make these decisions and has suffered concrete injury, including irrigation-testing/treatment costs for well water applied to food crops. The Authority's conduct also threatens to cause increased costs for installing treatment systems, blending water sources, abandoning wells, and seeking alternative water sources, as well as changes in irrigation practices and reductions in crop productivity. Center Point cannot properly evaluate these harms without the sampling, monitoring, and reporting data the Authority has failed to generate and disclose. This harm is not speculative or a generalized grievance; it is the direct, traceable consequence of the Authority's failure to monitor, sample, and report, and it would be redressed by an order compelling compliance.

16. The Authority's conduct also causes, or threatens to cause, harm to WOTUS, including the Receiving Waters, because such monitoring measures have been determined by the State Water Resources Control Board to be necessary to determine whether violations of the Act are causing, or threatening to cause, harm to WOTUS and to avoid creating an unreasonable risk of injury to WOTUS.

## III.

## BACKGROUND

17. ***The Clean Water Act.*** The Clean Water Act is the primary federal statute protecting surface waters in the United States. The Act aims to prevent, reduce, and eliminate pollution in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In order to accomplish that goal, section 301(a), 33 U.S.C. § 1311(a), prohibits

the "discharge of a pollutant" into "waters of the United States" without, or in violation of, a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402, 33 U.S.C. § 1342(b). *See* 40 C.F.R. § 122.26(c)(1). The Act also makes any violation of an NPDES permit a violation for which the permittee is liable. *See* 33 U.S.C. § 1365(a)(1); 40 C.F.R. § 123.45, App'x A.

18. The "discharge of a pollutant" means, inter alia, the addition of any "pollutant" to "waters of the United States" from any "point source." *See* 33 U.S.C. § 1362(12); 40 C.F.R. § 122.2. A "point source" is "any discernable, confined and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). A "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); 40 C.F.R. § 122.2.

19. The CWA authorizes citizens to bring an enforcement action against any person who violates "an effluent standard or limitation" of the CWA. 33 U.S.C. § 1365(a). "Effluent standard or limitation" includes any NPDES permit condition or requirement. 33 U.S.C. § 1365(f). To facilitate citizen oversight of water pollution and to encourage the filing of citizen enforcement suits, the CWA requires the monitoring of pollution discharges and makes the discharge data available to the public. 33 U.S.C. § 1318.

20. Accordingly, the CWA allows citizen suits based on violations of any conditions of a permit, even those which are purely procedural. *Ecological Rights Found. V. Pacific Lumber Co.* (9th Cir. 2000) 230 F.3d 1141, 1151; and see 33 U.S.C. § 1318.

21. The CWA grants jurisdiction to United States District Courts to enforce effluent standards or limitations, to issue injunctions, and to award costs of litigation to citizen plaintiffs. 33 U.S.C. § 1365(a), (d).

22. ***The NPDES Program.*** The Act authorizes the United States Environmental Protection Agency ("EPA") to delegate administration of the NPDES permitting system to any State or Region. In California, the NPDES program is administered by the California State Water Resources Control Board

("State Board") subject to the oversight of the EPA. An NPDES discharge permit contains limits on the discharge of allowable pollutants and contains pollutant monitoring and reporting requirements.

23. There are two types of NPDES permits: individual permits and general permits. Individual permits are written to reflect site-specific conditions of a single discharger based on information submitted by that discharger in a permit application and are issued to a specific discharger. General permits, on the other hand, are written to cover multiple dischargers with similar operations and types of discharges based on the permit writer's professional knowledge of those types of activities and are not issued to any particular discharger. Instead, multiple dischargers "obtain coverage" under a general permit after it is issued, consistent with the permit's eligibility and authorization provisions.

24. ***The Construction General Permit.*** In 2009 the SWRCB adopted California's Construction General Stormwater Permit, Order No. 2009-009-DWQ ("Construction General Permit" or "CGP").[1] The Construction General Permit regulates stormwater runoff from construction sites under a single, general NPDES permit. To obtain coverage under the Construction General Permit, dischargers electronically file Permit Registration Documents ("PRDs"), including a Notice of Intent ("NOI"), a Storm Water Pollution Prevention Plan ("SWPPP"), and other compliance-related documents to an online public database known as the "Stormwater Multiple Application and Report Tracking System" or "SMARTS."

25. ***The Authority's NPDES Permit Coverage.*** The Authority obtained coverage for the Project's construction activities from Fresno to Merced, including California High-Speed Train Construction Package 1 ("CP-1"), under the Construction General Permit, a general NPDES permit, and was issued Waste Discharger Identification ("WDID") No. 5F20C369876 effective May 30, 2014. The Authority has not terminated its coverage or compliance obligations under the Construction General Permit, since no Notice of Termination has been submitted.

26. The Construction General Permit establishes certain risk-based compliance obligations. CP-1 is designated a Risk Level 2 project, which signifies a higher risk to receiving water quality and/or sediment, and imposes a higher level of compliance obligations.

---

[1] The term "Construction General Permit" refers to Order No. 2009-009-DWQ as well as any amendments thereto, including without limitation Order 2010-0014-DWQ and Order 2012-0006-DWQ.

27. ***The Point Sources.*** The location of the primary point sources consists of the areas encompassed by CP-1 (as described in the approved SWPPP prepared for WDID No. 5F20C369876), including, without limitation, the construction corridor between Avenues 10 and 12 in Madera County, California. These areas are referred to herein as the "Project Site."

28. ***The Unlawful Conduct.*** The Authority's operations at the Project Site have been, and continue to be, in violation of the Act as a result of continuous and ongoing violations of the Construction General Permit and/or continuous and ongoing unlawful discharges as set forth herein, and such unlawful conduct has caused, and will continue to cause, harm to Center Point.

29. ***The Affected Water Bodies***. The Authority's Project activities discharge stormwater and pollutants via overland flow into, inter alia, the Fresno River, Cottonwood Creek, and the San Joaquin River (the "Receiving Waters"), which are waters of the United States" ("WOTUS") within the meaning of the CWA. The Authority's Project activities also discharge stormwater and pollutants into the San Joaquin Valley Groundwater Basin.

a. Specifically, the pollutants that have been and continue to be discharged from the Project Site (including the Guideway and the CP-1 construction corridor between Avenues 10 and 12) onto the Affected Property and into the Receiving Waters and groundwater are sediment and fine soils, including sediment from the sparsely vegetated earthen berm along the outer edge of the Guideway and from eroded, unstabilized areas along the Guideway, causing elevated turbidity, and all stormwater pollutants identified in the CP-1 SWPPP, including (i) masonry products, (ii) methyl methacrylate, (iii) fly ash/foundry sand, (iv) nonpigmented curing compounds, (v) surface cleaners/acids and bleaches, (vi) trisodium phosphate detergent, (vii) solvents, (viii) batteries, (ix) metals, (x) adhesives, (xi) salts, (xii) asbestos, (xiii) pesticides/herbicides, (xiv) fertilizers, (xv) resins/sealants, (xvi) cold mix, (xvii) solder, (xviii) flux, (xix) treated wood, and (xx)

b. The Affected Property and the Project Site lie within the Root Creek-San Joaquin River watershed. Polluted stormwater is conveyed from these point sources to WOTUS by the following pathway: the Authority constructed a system of earthen and lined ditches along the east and west sides of the raised guideway and embankment; the east-side ditch collects runoff and conveys it, together with onsite track and embankment runoff, onto the land within the access easement parcels (identified as MF-

20-1043-1, MF-20-1044-2, and MF-20-1045-2) through a series of underground pipes and inlets, while the unlined west-side ditches spill over onto adjacent ground and continue toward the west as sheet flow; runoff also passes through five sets of 36-inch cross-culverts located at Sta 10109+45, Sta 10114+10, Sta 10123+00, Sta 10130+00, and Sta 10138+00, including a particularly large erosion discharge near Sta 10105+00, and thereafter drains through the Root Creek-San Joaquin River watershed to the Fresno River (at the Fresno River Viaduct), Cottonwood Creek (at the Cottonwood Creek HST Bridge), and the San Joaquin River (at the San Joaquin River Viaduct).

c. These discharges occur during and after qualifying storm events (*i.e.*, precipitation of 0.5 inches or more), including the qualifying events of January 31 through February 2, 2024 and February 17 through 20, 2024. Qualifying storm events capable of producing such discharges have recurred throughout the relevant period, including approximately ten in reporting year 2015-2016, nine in 2016-2017, seven in 2017-2018, eight in 2018-2019, six in 2019-2020, three in 2020-2021, four in 2021-2022, and six in 2022-2023, none of which the Authority sampled.

## IV.

## CLAIM FOR RELIEF – VIOLATIONS OF THE CLEAN WATER ACT

30. The Authority has repeatedly violated, and continues to violate, the CWA in that it has failed, and continues to fail, to adhere to its obligations under the Construction General Permit at the Project Site. The Authority's continuous and ongoing violations of the Construction General Permit include violations of:

a. Section I.L (Post-Construction Requirements) and Section XIII (Post-Construction Standards), including, but not limited to, failure to develop, implement, and/or maintain adequate and effective post-construction best management practices ("BMPs") and hydromodifications;

b. Section I.M (SWPPP Requirements) and Section XIV (SWPPP Requirements), including, but not limited to, failure to develop, implement, and/or maintain an adequate and effective SWPPP;

c. Section II.B.3 (Permit Registration Document Requirements), Section XIV (SWPPP Requirements), and Attachment B (Permit Registration Documents), including, but not limited to, failure to develop, implement, and/or maintain adequate and effective Water Pollution Control

Drawings ("WPCDs") reflecting an effective combination of erosion and sediment control best management practices ("BMPs") and control measures ("CM") meeting the Best Management Practices/Best Convention Technology ("BAT/BCT") performance standards;

d. Section I.J (Sampling, Monitoring, Reporting and Record Keeping) and Attachment B (Permit Registration Documents), including, but not limited to, failure to develop, implement, and/or maintain adequate and effective WPCDs for the area consisting of the guideway segment between Avenue 12 and Avenue 11 located on Center Point's real property (the "Guideway");

e. Section I.J (Sampling, Monitoring, Reporting and Record Keeping), Section V (Effluent Standards & Receiving Water Monitoring), Section XIV (SWPPP Requirements), Attachment B (Permit Registration Documents), and Attachment D (Risk Level 2 Requirements), including, but not limited to, failure to develop and/or implement adequate and effective sampling, monitoring, reporting, and recordkeeping protocols for stormwater discharged from the Project Site, and failure to properly identify adequate and effective stormwater discharge and/or visual inspection locations at the Project Site.

f. Section I.D (Obtaining and Modifying General Permit Coverage), Section IV (Special Provisions), and Attachment D, Section C (Risk Level 2 Non-Storm Water Management), including, but not limited to, failure to develop, implement, and/or maintain adequate and effective protocols to mitigate the repeated direct discharge of non-approved non-storm waters to WOTUS;

g. Section I.D (Obtaining and Modifying General Permit Coverage), Section IV (Special Provisions), and Attachment D (Risk Level 2 Requirements), including, but not limited to, failure to develop, implement, and/or maintain an adequate and effective Construction Site Monitoring Plan ("CSMP"); and

h. Section I.J (Sampling, Monitoring, Reporting and Record Keeping), Section IV (Special Provisions), and Section XVI (Annual Reporting Requirements), including, but not limited to, repeated failure to certify and submit accurate and complete Construction General Permit Annual Reports.

///

///

**THE AUTHORITY IS NOT IN COMPLIANCE WITH ALL APPLICABLE RUNOFF REDUCTION REQUIREMENTS FOR THE PROJECT SITE**

31. Section XIII of the Construction General Permit describes the runoff reduction requirements that all permitted dischargers must satisfy. As pertinent here, it requires dischargers (1) to calculate the project-related increase in runoff volume and to select impervious area and runoff reduction credits to reduce the project-related increase in runoff volume to pre-project levels; and (2) to implement BMPs to reduce pollutants in stormwater discharges that are reasonably foreseeable after all construction phases have been completed at the site (i.e., "Post-Construction BMPs").

32. Based on documents the Authority has submitted to the SWRCB via SMARTS, the California High-Speed Train Construction Package 1 ("CP-1")[2] obtained coverage under the Construction General Permit and was issued WDID No. 5F20C369876. The SWPPP for CP-1 (the "CP-1 SWPPP") became effective in May 30, 2014.

33. Center Point is informed and believes, and on that basis alleges, that the CP-1 SWPPP has been amended 44 times as of the date of filing.

34. Both the initial, April 2014 CP-1 SWPPP and the revised, July 2017 CP-1 SWPPP claim in Section 1.1 that the respective SWPPPs were prepared to comply with the Post-Construction BMP requirements of Section XIII of the Construction General Permit. Despite this representation of compliance, however, Section 3.4 (Post-Construction Stormwater Management Measures) of the CP-1 SWPPP states:

> For the remaining areas associated with CP-1 not located in an area subject to a Phase I or Phase II MS4 permit, ***HSRA is working with the SWRCB to obtain an Individual HST MS4 Permit*** from the SWRCB prior to completion of the first operational storm drain. . .
>
> With respect to implementation of storm water control measures and design and construction of post-development BMPs, ***HSRA anticipates*** that the Individual HST MS4 Permit post-development storm water management requirements and standards (including those for water quality treatment, low impact development, and Hydromodification) ***will be*** based upon, and substantially similar to the 2012 Caltrans MS4 Permit.

(Emphasis added.)

[2] CP-1 addresses the construction of the initial Merced to Fresno section of the Project and incorporates HSRA Project construction activities across Center Point properties.

35. Contrary to the representations made in Section 1.1 of the CP-1 SWPPP, there is no evidence that the Authority has complied with either the runoff reduction or Post-Construction BMP requirements of Section XIII of the Construction General Permit for any portion of the Project Site, including the construction corridor that lies outside the boundaries of a Phase 1 or Phase II MS4 with an approved SWMP.[3]

36. Section 402 of the CWA mandates that BMPs be designed to achieve strict compliance with federal technology-based and water quality-based standards. Dischargers are not permitted to unilaterally select alternative compliance options or to defer compliance to a future NPDES not yet adopted.

37. The Authority has therefore failed to comply with all requirements set forth in Section XIII of the Construction General Permit applicable to its operations at the Project Site.

38. Moreover, Center Point is informed and believes, and on that basis alleges, that some of the Authority's unlawful conduct, including without limitation its failure to comply with hydromodification and Post-Construction BMP requirements, was knowing and/or intentional. The Authority's unlawful conduct, including without limitation its failure to comply with hydromodification and Post-Construction BMP requirements, was also objectively unreasonable and a manifestly erroneous application of the law.

39. The Authority's failure to comply with section XIII of the Construction General Permit has caused, and will continue to cause, an increased volume of stormwater and pollutants being discharged from the Project Site onto the Affected Properties resulting in flooding and other adverse impacts to Center Point's injury.

///

///

///

///

[3] In 2014 the Discharger applied for permit coverage as a Non-Traditional Small Municipal Separate Stormwater Sewer System ("SMS4"), Water Quality Order No. 2013-001-DWQ (CAS000004), and was issued WDID No. 5F10M2000258. However, the SMS4 does not go into effect until after the HSRA has completed the California High Speed Train Project and the SMS4 is fully operational.

**THE AUTHORITY HAS FAILED TO DEVELOP AND/OR IMPLEMENT AN ADEQUATE AND EFFECTIVE CONSTRUCTION STORMWATER MONITORING PROGRAM FOR THE PROJECT SITE**

40. Plaintiff is informed and believes, and on that basis alleges, that the Authority has not filed a Notice of Termination ("NOT") nor removed Avenue 11, Avenue 12, or the Guideway from coverage under the Construction General Permit. Therefore, all conditions and requirements of the Construction General Permit remain in effect, including without limitation monitoring and maintaining all BMPs, implementing corrective actions, and amending the CP-1 SWPPP to reflect changed field conditions, new work areas, or other actions needed to comply with the Construction General Permit.

41. The Authority has not discharged its duties under the CWA simply because it is not actively performing work at certain areas of the Project Site. Among other things, the Construction General Permit requires the Authority to continue to stabilize all inactive work areas and to continue collecting stormwater discharge samples, performing weekly inspections, preparing Rain Event Action Plans ("REAPs"), conducting pre- and post-storm inspections, and undertaking corrective actions as needed to ensure compliance on an ongoing basis.

42. As explained in more detail below, the Authority is in violation of the CWA because it has failed to comply with all applicable requirements of the Construction General Permit in connection with its operations at the Project Site. Specifically, the Authority has failed to develop and/or implement a Construction Stormwater Monitoring Program for all areas of the Project Site in accordance with the requirements of the Construction General Permit.

43. The Authority's failure to develop and/or implement an adequate and effective Construction Stormwater Monitoring Program for all areas of the Project Site in accordance with the requirements of the Construction General Permit has caused, and will continue to cause, an increased volume of stormwater and pollutants being discharged from the Project Site onto the Affected Properties resulting in flooding and other adverse impacts to Center Point's injury.

44. Additionally, Center Point is informed and believes, and on that basis alleges, that the Authority's failure to develop and/or implement an adequate and effective Construction Stormwater Monitoring Program for all areas of the Project Site in accordance with the requirements of the

Construction General Permit was knowing and/or intentional. The Authority's failure to develop and/or implement an adequate and effective Construction Stormwater Monitoring Program for all areas of the Project Site in accordance with the requirements of the Construction General Permit was also objectively unreasonable and a manifestly erroneous application of the law.

45. ***Inadequate Water Pollution Control Drawings***. An integral part of a SWPPP is the requirement for Water Pollution Control Drawings ("WPCDs") that accurately show the work activities, drainage patterns (by phase of work), discharge locations, all permanent and temporary work and laydown areas, and sampling locations throughout all phases of construction. The WPCDs must show, inter alia, the locations of specific BMPs to meet BAT/BCT standards. Meeting BAT/BCT standards is demonstrated through an "effective combination of erosion and sediment control BMPs" (administrative and structural) and field monitoring to verify and document BMP effectiveness.

46. Plaintiff is informed and believes, and on that basis alleges, that although the CP-1 SWPPP has been amended 44 times, it has not been amended to include WPCDs for all areas of the Project Site, including, but not limited to, the Guideway and areas of the Project Site discharging stormwater and pollutants onto the Affected Property.

47. Accordingly, the CP-1 SWPPP fails to satisfy the Construction General Permit's requirements for WPCDs as a result of, inter alia, the Authority's failure (i) to prepare adequate and effective WPCDs for all areas of the Project Site, including, but not limited to, for the Guideway; and (ii) to depict all drainage paths at the Project Site on the WPCDs that were prepared.

48. ***Failure to Develop and/or Implement Appropriate Erosion Control BMPs***. Risk Level 2 dischargers are required to implement adequate and effective erosion control BMPs (runoff control and soil stabilization) in conjunction with sediment control BMPs for areas under active construction as well as for inactive work areas. For inactive work areas, Risk Level 2 dischargers must also stabilize all disturbed soil areas so they no longer pose a threat to water quality.

49. The Authority's operations at the Project Site have been and remain subject to Risk Level 2 requirements.

50. The Authority failed to provide an adequate combination of erosion and sediment control BMPs during active construction by, inter alia:

a. failing to develop, implement, and/or maintain an adequate and effective earthen ditch temporary sediment control BMP as called for in Section 3.2 of the CP-1 SWPPP;

b. failing to develop all temporary sediment control BMPs in accordance with appropriate design standards and/or failing to properly identify or reference all design standards used to develop temporary sediment control BMPs;

c. failing to prepare adequate WPCDs for the Project Site, including the Guideway;

d. failing to discuss or reference erosion control BMPs on all WPCDs;

e. failing to develop and/or implement adequate and effective perimeter control at the base of the roadway embankments at Avenues 11 and 12; and

f. using an earthen berm along the outer edge of the Guideway that not only fails to satisfy BAT/BCT standards but also constitutes a source of stormwater pollutants.

51. Accordingly, the Authority is in violation of the CWA due to its continuous and ongoing (i) failure to develop, implement, and/or maintain an adequate and effective combination of erosion and sediment control BMPs in accordance with the requirements of the Construction General Permit, and (ii) failure to stabilize all inactive work areas in accordance with BAT/BCT standards, which has left many areas of the Project Site unstabilized, and such unlawful conduct has caused, and will continue to cause, harm to the Affected Property and Center Point.

52. ***Inadequate Site Monitoring***. Since the Authority has not terminated or modified permit coverage, it is obligated to continue implementing the construction site monitoring requirements of the CP-1 SWPPP. Construction within a Risk Level 2 watershed requires, inter alia, monitoring and inspection, including visual inspections, visual monitoring of discharges, preparation of Rain Event Action Plans ("REAPs"),[4] monitoring of construction site runoff (discharges) for pH and turbidity, and sampling of nonvisible pollutants.

///

///

[4] CGP, Attachment D, Risk Level 2 Requirements, Section H5 indicates that the discharger must ensure the QSP developed REAPs for sites where construction activities are halted or postponed (inactive construction).

53. Stormwater continues to be discharged from the Guideway onto the Affected Properties along the entirety of the Guideway. Additionally, several large, eroded areas exist along the Guideway alignment, including a particularly large erosion discharge near Sta 10105+00.

54. Center Point is informed and believes, and on that basis alleges, that visual inspections, weekly monitoring, or REAPs are either not being performed at the Project Site or are being performed in an inadequate manner, contrary to the requirements of the Construction General Permit.

55. Accordingly, Center Point is informed and believes, and on that basis alleges, that the Authority failed to develop and/or implement adequate monitoring and sampling protocols for the Project Site in accordance with the requirements of the Construction General Permit.

56. ***Inadequate Stormwater Discharge Sampling Protocols***. Pursuant to Section 7.7.2.2 of the CP-1 SWPPP, prior to the commencement of any construction at the Project Site, the Authority must identify sampling locations for run-on (to establish background conditions) and discharge locations (for testing pH and turbidity and nonvisible pollutants) on the relevant WPCDs.

57. However, contrary to the requirements of the Construction General Permit and the CP-1 SWPPP, the Authority did not identify any sampling points for run-on at the Project Site prior to the commencement of construction at the Project Site and did not create a WPCD for the Guideway prior to the commencement of construction at the Project Site.

58. Further, Center Point is informed and believes, and on that basis alleges, that to date the Authority still has not identified all sampling points for run-on at the Project Site and has not created a compliant WPCD for the Guideway.

59. ***Failure to Conduct Adequate Stormwater Discharge Sampling.*** Work in a Risk Level 2 watershed requires discharges from permitted areas to meet the narrative and numeric effluent discharge limitations. For any discharge, at least three daily grab samples must be collected and analyzed during qualifying storm events. Sampling is required whenever there is discharge from the Project Site during regular business hours and it is safe to collect samples. The results must be uploaded to SMARTS for any "qualifying storm event" that causes a discharge. A "qualifying storm event" means "any event that produces 0.5 inches or more of precipitation with a 48 hour or greater period between rain events."

60. Although there have been multiple qualifying storm events in recent years, sampling data for all areas of the Project Site have not been uploaded to SMARTS, including for areas in and around the Guideway, indicating the Authority has failed to conduct sampling within these areas, and others, in accordance with the requirements of the Construction General Permit and/or failed to upload sampling data to SMARTS as required, including, but not limited to, for the 2023-2024 reporting period.

61. Center Point is informed and believes, and on that basis alleges, that to date the Authority has not identified sampling points for run-on at all required areas of the Project Site in the CP-1 SWPPP, has not developed an adequate WPCD for the Guideway, is not conducting sampling for all areas of the Project Site, and/or is not uploading all required sampling data to SMARTS in accordance with the requirements of the Construction General Permit.

62. Specifically, Center Point is informed and believes, and on that basis alleges, that required sampling was not performed, inadequately performed, or not properly reported in reporting periods 2018-2019, 2019-2020, 2020-2021, 2021-2022, and 2022-2023.

63. ***Failure to Conduct Adequate Inspections of Sampling Locations***. The Construction General Permit requires that sampling locations be inspected during storm events to determine if discharge occurs.

64. Although the WPCDs for the Project Site included six sampling and analysis locations for each grade separation, the Risk Level 2 Annual Reports and Ad Hoc Reports prepared by the Authority for the Project Site do not report ***any*** sampling events from either Avenue 11 or 12 grade separation or along the Guideway.

65. Center Point is informed and believes, and on that basis alleges, that the Authority failed to inspect all sampling locations during all qualifying storm events as required by the Construction General Permit. Alternatively, Center Point is informed and believes, and on that basis alleges, that the Authority either (i) failed to properly document and report the inspection of all sampling locations during all qualifying storm events in its Risk Level 2 Annual Reports and Ad Hoc Reports as required by the Construction General Permit, or (ii) falsified its Annual Reports and Ad Hoc Reports to conceal that discharges had in fact been occurring at the Project Site.

///

**THE AUTHORITY HAS FAILED TO DEVELOP, IMPLEMENT, AND/OR MAINTAIN A STORMWATER POLLUTION PREVENTION PLAN IN ACCORDANCE WITH THE CONSTRUCTION GENERAL PERMIT**

66. To obtain coverage under the Construction General Permit discharges must file, inter alia, a Storm Water Pollution Prevention Plan ("SWPPP") in accordance with the requirements of section XIV.

67. However, for the reasons set forth above, the CP-1 SWPPP does not satisfy the requirements of section XIV of the Construction General Permit.

68. Therefore, the Authority has failed to develop, implement, and/or maintain an adequate and effective SWPPP for the Project Site in accordance with the requirements of Section XIV of the Construction General Permit.

69. Center Point is informed and believes, and on that basis alleges, that the Authority's failure to develop, implement, and/or maintain a SWPPP for the Project Site in accordance with the requirements of section XIV of the Construction General Permit was, at least in some instances, knowing or intentional. In addition, the Authority's failure to develop, implement, and/or maintain a SWPPP for the Project Site in accordance with the requirements of section XIV of the Construction General Permit was objectively unreasonable and a manifestly erroneous application of the law.

70. The Authority's failure to develop, implement, and/or maintain a SWPPP for the Project Site in accordance with the requirements of section XIV of the Construction General Permit has caused, and will continue to cause, an increased volume of stormwater and pollutants being discharged from the Project Site onto other nearby properties, including the Affected Properties, the Receiving Waters, and into the San Joaquin Valley Groundwater Basin, thereby causing injury to Center Point and the public generally.

## VII.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court grant the following relief:

1. Judgment for Plaintiff in this matter;

2. An injunction (a) enjoining Mr. Choudri, in his official capacity as the Authority's Chief

Executive Officer, from committing, allowing, or facilitating any further conduct in connection with the Authority's operations at the Project Site that is in violation of the CWA or the Construction General Permit; and (b) ordering Mr. Choudri, in his official capacity as the Authority's Chief Executive Officer, to immediately take, or cause to be taken, all action necessary to ensure the Authority's compliance with the CWA and the Construction General Permit at the Project Site, including, but not limited to, all action necessary to ensure compliance with all post-construction requirements, BMPs, and other standards at the Project Site;

3. An order declaring that the Authority's operations at the Project Site are in violation of the CWA and the Construction General Permit for the reasons set forth in this Complaint;

4. An order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and California Code of Civil Procedure § 1021.5; and

5. Any other relief as this Court may deem just and appropriate.

Dated: September 11, 2026

WANGER JONES HELSLEY PC

*/s/ Jay A. Christofferson*

Jay A. Christofferson
Nicolas R. Cardella
Danika E. Jones
Attorneys for Plaintiff
CENTER POINT, LLC

EXHIBIT "A"

WANGER JONES HELSLEY PC
ATTORNEYS

OLIVER W. WANGER
TIMOTHY JONES*
MICHAEL S. HELSLEY
RILEY C. WALTER
PATRICK D. TOOLE
SCOTT D. LAIRD
JOHN P. KINSEY
KURT F. VOTE
TROY T. EWELL
JAY A. CHRISTOFFERSON
MARISA L. BALCH
AMANDA G. HEBESHA**
PETER M. JONES†
JEFFREY B. PAPE†
DEBORAH K. BOYETT
STEVEN K. VOTE
NICOLAS R. CARDELLA
GIULIO A. SANCHEZ
KATHLEEN D. DEVANEY
BENJAMIN C. WEST
HUNTER C. CASTRO
STEPHANIE M. HOSMAN
IAN J. QUINN††
RACHEL L. POMBO
NATHAN J. MARTIN
COLTEN D. BALLINGER
COLLEEN E. BUSBY
DANIKA E. JONES

* Also admitted in Washington
** Also admitted in Idaho
† Of Counsel
†† Also admitted in Texas

265 E. RIVER PARK CIRCLE, SUITE 310
FRESNO, CALIFORNIA 93720

MAILING ADDRESS
POST OFFICE BOX 28340
FRESNO, CALIFORNIA 93729

TELEPHONE
(559) 233-4800

FAX
(559) 233-9330

WJH

CLOVIS OFFICE:
642 Pollasky Avenue
Suite 100
Clovis, California 93612

OFFICE ADMINISTRATOR
LYNN M. HOFFMAN

Writer's E-Mail Address:
jchristofferson@wjhattorneys.com

Website:
www.wjhattorneys.com

October 29, 2024

**VIA UNITED STATES CERTIFIED MAIL**

High Speed Rail Authority
Hon. Members of the Board of Directors
Brian P. Kelly, Chief Executive Officer
770 L Street, Suite 620
Sacramento, CA 95814

**Re: 60-Day Notice of Violations and Intent to File Suit Under the Federal Clean Water Act, 33 U.S.C. § 1251 et seq.**

To Hon. Members of the Board of Directors and Chief Executive Officer Kelly:

The Federal Clean Water Act, 33 U.S.C. § 1251 et seq. (the "CWA" or "Act"), made it unlawful to discharge, directly or indirectly, any pollutant from a point source into navigable waters (i.e., Waters of the United States or "WOTUS"), unless a permit was obtained. Section 402 of the Act established the National Pollutant Discharge Elimination System ("NPDES"), the basic structure for regulating discharges of pollutants into WOTUS, including stormwater discharges. Any violation of a NPDES permit is a violation of the CWA for which the permittee is liable.

Stormwater discharges in California are regulated by the State of California Water Resources Control Board (the "SWRCB") through NPDES permits. The HSRA obtained coverage for the Project's construction activities from Fresno to Merced, California under California's

Construction General Stormwater Permit, Order No. 2009-009-DWQ[1] (the "CGP"), an NPDES permit, and was issued Waste Discharger Identification ("WDID") No. 5F20C369876 effective May 30, 2014.

Section 505(a) of the Act, 33 U.S.C § 1365(a), provides that any citizen may commence a civil action on his own behalf against any person, including any governmental instrumentality or agency, who is alleged to be in violation of either water quality effluent standard or limitation or an order issued by the EPA Administrator or a State with respect to such a standard or limitation. The CGP is an NPDES permit subject to the citizen suit provisions of Section 505(a) of the Act.

This letter is being sent to you on behalf of Center Point, LLC ("Center Point") as legal notice that Center Point intends to file a civil action against the California High Speed Rail Authority and its officers and other legally responsible parties (collectively, "Discharger" or "HSRA") for violations of the Act pursuant to Section 505(a) of the Act, 33 U.S.C § 1365(a). Center Point alleges that HSRA has committed violations of the Act, NPDES No. CAS000002, the CGP, WDID 5F20C369876, California Water Code § 13377, et seq., and the Central Valley Regional Water Control Board's Basin Plans, that such violations have occurred in the area of the Project (as defined in § II, *infra*) since at least 2017. Center Point further alleges that such violations, including unlawful discharges from the Project onto the Site (as defined in § II, *infra*) are ongoing and continuous.

The HSRA's failure to comply with the Act in the area of the Project has resulted in polluted stormwater being discharged onto Center Point's properties, the Receiving Waters (as defined in Section III, *infra*), and/or the underlying groundwater aquifer. HSRA's failure to comply with the Act and the resulting unlawful discharges of pollutants from the Project onto the Site as alleged herein has adversely affected Center Point and caused it actual harm, including flooding Center Point's properties, polluting the Receiving Waters, and/or polluting the groundwater Center Point relies upon for agricultural uses, and will continue to cause Center Point harm unless and until such unlawful acts and discharges are permanently ceased. Accordingly, Center Point has standing to bring suit against the HSRA for the violations alleged herein.

Section 505(b) of the Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under section 505(a), a citizen must give notice of intent to file suit to the alleged violators as well as specified state and federal officials. As required by section 505(b) of the Act, this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur in the area of the Project and the Site. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, Center Point reserves the right to file suit in federal court against the HSRA under section 505(a) of the Act for the violations described more fully below, if this matter cannot be resolved.

///

---

1 As amended by Order 2010-0014-DWQ and Order 2012-0006-DWQ.

## I. THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

Center Point alleges that HSRA's operations in the area of the Project have resulted in continuous and ongoing violations of the substantive and procedural requirements of the Act and caused unlawful discharges onto the Site in violation of the Act, the CGP (as amended), the Project's NPDES Permit, WDID No. 5F20C369876, California Water Code § 13377, et seq., and the Central Valley Regional Water Control Board's Basin Plans.

## II. THE LOCATION OF THE ALLEGED VIOLATIONS

The location of the point sources from which pollutants and stormwater are discharged in violation of the Act consist of the areas encompassed by California High-Speed Train Construction Package 1, as described in the approved SWPPP prepared for WDID No. 5F20C369876, effective May 30, 2014, as well as those portions of Center Point's property over which the State and/or HSRA hold easements (the "Easement Properties"), including the construction corridor between Avenues 10 and 12 in Madera County, California. These areas are referred to in this Notice as the "Project." The Project has caused discharges of stormwater and pollutants in violation of the Act onto the Easement Properties as well as other properties owned by Center Point in the area of the Project, thereby harming Center Point. These areas are referred to in this Notice as the "Site."

The HSRA is a public body established pursuant to the California Public Utilities Code section 185000 et seq and is responsible for planning, designing, building and operating the first statewide high-speed train system in the nation, the California High Speed Train Project. The HSRA's Project operations are subject to the 2009 Construction General Permit (as amended).

According to the SWRCB's 2009 Construction General Permit Fact Sheet, construction sites that require CGP coverage, can cause discharges of sediment that exceed permissible levels of pollutants in stormwater discharges; can transport pollutants at elevated levels onto adjacent lands and into nearby waters and can erode the land over which the discharge flows, if not properly controlled. The 2014 SWPPP prepared for HSRA's CGP WDID No. 5F20C36987 identifies an extensive list of potential sources of stormwater pollutants associated with the HSRA Project's construction activities that could be deposited onto the Site from the Project's stormwater discharges, including but not limited to : masonry products, methyl methacrylate, fly ash/foundry sand, nonpigmented curing compounds, surface cleaners/acids, surface cleaners/bleaches, trisodium phosphate detergent, solvents, batteries, metals, adhesives, salts, asbestos, pesticides/herbicides, fertilizers, resins/sealants, cold mix, solder, flux, and treated wood.

## III: THE AFFECTED RECEIVING WATERS

The Project discharges stormwater, either directly or indirectly via overland flow into the Fresno River, Cottonwood Creek, and the San Joaquin River (the "Receiving Waters").

Some or all of these water bodies, including the San Joaquin River, are WOTUS. The CWA requires that WOTUS meet water quality objectives that protect specific "beneficial uses."

The Regional Water Board has issued its Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters that the Project may discharge to include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

Direct and indirect discharges of polluted stormwater and non-stormwater discharges from construction sites, such as those within the Project area, contribute to the degradation of surface waters, harm aquatic dependent wildlife, and can lead to the body being designated as an impaired water body pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d) if its Beneficial Uses are not being achieved due to the presence of one or more pollutants.

## IV. VIOLATIONS OF THE CLEAN WATER ACT AND THE CONSTRUCTION GENERAL PERMIT

Information available to Center Point indicates that the Discharger has failed to comply with the authorities identified above on numerous occasions and on a reoccurring and continuous basis, including:

- Failure to comply with Section I.L and Section XIII of the CGP, including but not limited to hydromodifications and Post-Construction BMP requirements;
- Failure to comply with Section I.M and Section XIV of the CGP, including but not limited to failure to develop, implement, and maintain an effective Stormwater Pollution Prevention Plan;
- Failure to develop adequate Water Pollution Control Drawings ("WPCDs") in accordance with Section II, B. 3 , Section XIV, and Attachment B of the CGP, including but not limited to WPCDs that that reflected an effective combination of erosion and sediment control best management practices ("BMPs") and control measures ("CM") that meets the CGP Best Management Practices/Best Convention Technology (BAT/BCT) performance standards;
- Failure to develop any WPCDs in accordance with Attachment B, Section J of the CGP including but not limited WPCDs for the guideway segment between Ave 12 and Ave 11 located on Center Point properties (the "Guideway");

- Failure to properly identify stormwater discharge and/or visual inspection locations in accordance with Section I.J, Section V, Section XIV, and Attachments B and D of the CGP;
- Failure to comply with the CGP's requirements with respect to the collection and/or analysis of stormwater discharged from the Project onto the Site;
- Failure to comply with Section I.D, Section IV, and Section C of Appendix D of the CGP, including but not limited to mitigating the repeated direct discharge of non-approved non-stormwaters to WOTUS;
- Failure to develop, implement, and maintain an adequate and effective Construction Site Monitoring Plan ("CSMP") in accordance with Section I.D, Section IV, and Appendix D of the CGP; and
- Failure to certify and submit and/or falsification of CGP Annual Reports in violation of Section I.J, Section IV, and Section XVI of the CGP.

**A. Violation of Section XIII of the Construction General Permit**

Section XIII of the 2009 CGP describes the runoff reduction requirements that all permitted dischargers must comply with, including:

- Calculate the project-related increase in runoff volume and select impervious area and runoff reduction credits to reduce the project-related increase in runoff volume to pre-project levels; and
- Implement BMPs to reduce pollutants in stormwater discharges that are reasonably foreseeable after all construction phases have been completed at the site (i.e., Post-Construction BMPs).

Based on documents submitted to SMARTS by the Discharger the California High-Speed Train Construction Package 1 ("CP-1")[2] obtained coverage under the 2009 GCP and was issued WDID No. 5F20C369876. The SWPPP for CP-1 (the "SWPPP") became effective in May 30, 2014, has been amended 42 times, and was last updated on July 10, 2017.

Both the initial April 2014 SWPPP, and the July 2017 updated SWPPP, claim in Section 1.1 that the SWPPP has been prepared to comply with the Post-Construction BMP requirements

2 CP-1 address the construction the initial Merced to Fresno section of the Project and incorporates HSRA Project construction activities across Center Point properties.

of Section XIII of the 2009 CGP. However, despite this representation of compliance, Section 3.4, Post-Construction Stormwater Management Measures, states:

> For the remaining areas associated with CP-1 not located in an area subject to a Phase I or Phase II MS4 permit, ***HSRA is working with the SWRCB to obtain an Individual HST MS4 Permit*** from the SWRCB prior to completion of the first operational storm drain. . .
>
> With respect to implementation of storm water control measures and design and construction of post-development BMPs, ***HSRA anticipates*** that the Individual HST MS4 Permit post-development storm water management requirements and standards (including those for water quality treatment, low impact development, and Hydromodification) ***will be*** based upon, and substantially similar to the 2012 Caltrans MS4 Permit.[3]

Contrary to the representations made in Section 1.1, there is no evidence that the HSRA has complied with either the runoff reduction or Post-Construction BMP requirements of Section XIII for any portion of the Project area, including the construction corridor that lies outside the boundaries of a Phase 1 or Phase II MS4 with an approved SWMP.

In 2014 the Discharger applied for permit coverage as a Non-Traditional Small Municipal Separate Stormwater Sewer System ("SMS4"), Water Quality Order No. 2013-001-DWQ (CAS000004), and was issued WDID No. 5F10M2000258. However, the SMS4 does not go into effect until after the HSRA has completed the California High Speed Train Project and the SMS4 is fully operational.

Section 402 of the CWA mandates that BMPs be designed to achieve strict compliance with federal technology-based and water quality-based standards. Center Point is unaware of any regulatory provision or permit condition that allows the Discharger to unilaterally select alternative compliance options to Section XIII of the CGP, or to defer compliance to a future NPDES not yet developed or enforced

Accordingly, HSRA's failure to comply with Section XIII of the CGP constitutes a violation of both the CGP and the Act. This violation has resulted in an increased volume of stormwater being discharged onto the Site from the Project area resulting in flooding at the Site. Moreover, under these circumstances, and considering the information available to Center Point, it appears that at least some of the HSRA's failures to comply with the CGP, including its failure to comply with hydromodification and post construction BMP requirements, may have been knowing or intentional.

///

---

[3] Emphasis added.

### B. Other Violations of the Construction General Permit

The CGP requires that a SWPPP be amended to reflect changed field conditions, new work areas, or other actions needed to comply with the permit. However, HSRA has not filed a Notice of Termination ("NOT") nor removed Avenue 11, Avenue 12, nor the Guideway from permit coverage. Therefore, all conditions and requirements of the CGP are still in effect, including monitoring and maintaining any BMPs and implementing corrective actions within 72 hours or the next storm event, whichever comes first.

***Inadequate Water Pollution Control Drawings***. An integral part of the SWPPP is the requirement for Water Pollution Control Drawings ("WPCDs") that accurately show the work activities, drainage patterns (by phase of work), discharge locations, all permanent and temporary work and laydown areas, and sampling locations throughout all phases of construction. The WPCDs must show the location specific BMPs to meet the CGPs' performance standards of BAT/BCT requirements. Meeting BAT/BCT standards is demonstrated through an "effective combination of erosion and sediment control BMPs" (administrative and structural) and field monitoring.

To date, the SWPPP has been amended 42 times. Amendments 26 through 35 roughly cover the period just before the start of work and during construction at Avenue 12 and Avenue 11, including the guideway. Amendment 26 included updated plans for the Avenue 12 disturbance, and Amendment 33 included updated plans (and additional acreage) for Avenue 12 and Avenue 11. However, it appears the SWPPP has not been amended to include WPCDs for the guideway through the Easement Properties or any WPCDs or amendments that incorporated the planned grading of the access easement on the Easement Properties. Consequently, the WPCDs for Avenues 11 and 12 do not adequately show drainage paths. This deficiency renders the SWPPP inadequate in violation of the CGP.

***Failure to Develop and/or Implement Appropriate Erosion Control BMPs***. Risk Level 2 dischargers are required to implement appropriate erosion control BMPs (runoff control and soil stabilization) in conjunction with sediment control BMPs for areas under active construction. For inactive work areas, Risk Level 2 dischargers must provide effective cover in inactive areas.

The SWPPP includes erosion and sediment control BMPs. An earthen ditch, a temporary sediment control BMP, was included as an alternate BMP. Section 3.2 states:

> TPZP shall establish an earthen ditch along the construction site boundary such that runoff is conveyed to the ditch, thereby reducing the potential for offsite sedimentation. The construction area shall be graded such that onsite runoff is conveyed to the earthen ditch. All earthen ditches shall be inspected regularly for erosion and accumulation of debris and sediment. Debris and sediment shall be removed as needed

Although HSRA proposed capturing stormwater runoff from the Project area into temporary ditches as a means to prevent offsite discharge of stormwater, no design standard/fact sheet (CASQA or CalTrans) for this BMP was included or referenced in the SWPPP. The Caltrans BMP design standard is SS-9 but this was not included in the SWPPP. Without using this BMP, stormwater discharges off the Project area would occur, including onto the Site, and there is no means to capture runoff and treat it before discharge (via sediment ponds or filter structures).

Further, the WPCDs and amendments issued for Avenue 11 and Avenue 12 did not include an earthen ditch BMP. Instead, the WPCDs primarily focused on the use of other sediment control BMPs for perimeter control, including fiber rolls, silt fence, and dirt berm. However, none of the SWPPP's amendments appear to include perimeter control beyond a fiber roll at the base of the roadway embankments at Avenues 11 and 12. Additionally, there is no discussion or reference to erosion control BMPs on the WPCDs, indicating HSRA failed to use an effective combination of erosion and sediment control BMPs on active work areas, as required by the CGP and BAT/BCT standards.

Moreover, while this BMP was replaced with an "earthen berm" or "dirt berm" BMP on some amendments for Avenues 11 and 12, no "earthen berm" or "dirt berm" BMP design specification is included in the SWPPP or amendments, and neither CASQA nor Caltrans has an "earthen berm" or "dirt berm" BMP beyond the previously referenced SS-9 (Earth dike/drainage swale and lined ditches).

Information available to Center Point suggests that earthen berms may have been used along the outer edge of the guideway, but the "berm" is nothing more than sparsely vegetated linear piles of dirt, which would not only fail to satisfy CGP BAT/BCT standards but also would constitute a source of stormwater pollutants.

Additionally, along the Guideway, disturbed areas have not been stabilized, and no erosion or sediment control BMPs are in place to protect the Site from the discharge of stormwater and stormwater pollutants. Further, there is no discussion either in the SWPPP or the WPCDs that addresses stabilization or management of the Guideway once the areas become inactive.

Information available to Center Point also indicates that HSRA failed to provide an effective combination of erosion and sediment control BMPs during active construction and failed to prepare any WPCD for the Guideway, the Easement Properties, or the Site. Moreover, Center Point alleges that the Project's inactive work areas fail to meet the BAT/BCT standard, as they were either left disturbed (i.e., not stabilized) or the stabilization that was performed was inadequate or ineffective, such that these areas remain unstabilized to date.

***Inadequate Site Monitoring.*** Since the HSRA has not terminated or modified permit coverage, they are obligated to continue implementing the construction site monitoring requirements of the SWPPP. Construction within a Risk Level 2 watershed requires monitoring and inspection, including visual inspections, visual monitoring of discharges, preparation of Rain

Event Action Plans ("REAP"),[4] monitoring of construction site runoff (discharges) onto Center Point property for pH and turbidity, and sampling of nonvisible pollutants when applicable.

Information available to Center Point indicates several large, eroded areas along the Guideway alignment, including a particularly large erosion discharge near Sta 10105+00. This discharge likely occurred during recent storm events. Based on this, and the fact that stormwater continues to be discharged from the Guideway onto the Site along the entire structure, Center Point alleges that the required visual inspections, weekly monitoring, or REAPs are either not being performed at all or, if they are, are being performed in an inadequate manner.

***Inadequate Stormwater Discharge Sampling.*** Work in a Risk Level 2 watershed requires discharges from permitted areas to meet the narrative and numeric effluent discharge limitations. For any discharge, at least three daily grab samples must be collected and analyzed during qualifying storm events. Section 7.7.2.2 of the SWPPP discusses the sampling requirements within the Root Creek-San Joaquin River watershed. This section indicates that before construction begins within the Project area, sampling locations for run-on (to establish background conditions) and discharge locations (for testing pH and turbidity and nonvisible pollutants) will be identified on the WPCDs developed for that area. The sampling is required whenever there is discharge from the Project area during regular business hours and when it is safe to collect samples. The results are uploaded to SMARTS for any "qualifying storm event" that produces discharges. The CGP defines a qualifying storm event as "any event produces 0.5 inches or more of precipitation with a 48 hour or greater period between rain events."

Information available to Center Point indicates that HSRA failed to include any sampling points for run-on, never created a WPCD for the Guideway, and that no sampling data for this area was uploaded to SMARTS. Based on this, Center Point alleges that no sampling of construction stormwater runoff along the guideway was performed.

Additionally, the WPCDs for the Project area included six sampling & analysis locations for each grade separation. The CGP requires that the sampling locations be inspected during storm events to determine if discharge occurs. However, the submitted Risk Level 2 Annual Reports and Ad Hoc Reports do not report sampling events from either Avenue 11 or 12 grade separation or along the Guideway at any time. Based on this, and other information available to Center Point, Center Point alleges that the required inspections were not performed or were inadequately performed.

Annual Reports and Ad Hoc Reports uploaded to SMARTS indicate that no discharge occurred during any qualifying storm events, implying that there has not been a qualifying storm event throughout the entire length of the Root Creek-San Joaquin River watershed work areas for seven years, resulting in stormwater discharge from the Project area during business hours. Based on this, and other information available to Center Point, Center Point alleges that the required

[4] CGP, Attachment D, Risk Level 2 Requirements, Section H5 indicates that the discharger must ensure the QSP developed REAPs for sites where construction activities are halted or postponed (inactive construction).

sampling was not performed or was inadequately performed in reporting periods 2018-2019, 2019-2020, 2020-2021, 2021-2022, and 2022-2023.

***Failure to Implement Construction Stormwater Monitoring Program***. Since HSRA has not terminated permit coverage, they are still obligated to implement their Construction Stormwater Monitoring Program. Specifically, HSRA must continue conducting all the inspection, monitoring, and sampling requirements even in inactive work areas. HSRA is not "done" with their regulatory obligations along the Project area simply because they no longer work in certain areas. This also means HSRA is required to collect stormwater discharge samples (for turbidity and pH), perform weekly inspections, prepare REAPS, conduct pre- and post-storm inspections, and take corrective actions. Information available to Center Point indicates, and Center Point alleges, that HSRA has failed to comply with the above requirements. Further, Center Point is informed and believes and on such basis alleges that such failure is knowing and/or intentional.

***Similar Violations at Other Inactive Project Locations***. In light of the above, Center Point alleges that HSRA is committing similar violations as those outlined above at other inactive HSRA construction sites, including inactive HSRA construction sites along the length of the CP-1 within the Risk Level 2 location as well as other Risk Level 2 areas between Merced and Fresno.

## V. THE PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are the HSRA as well as its officials, employees, contractors, and agents responsible for the Project's compliance with the CWA and orders or enactments promulgated pursuant thereto.

## VI. THE DATES, OR REASONABLE RANGE OF DATES, OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is at least January 1, 2017 through the date of this Notice. Center Point may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice. Some of the violations are continuous in nature; therefore, each day constitutes a separate and distinct violation.

## VII. CONTACT INFORMATION

The entity giving this 60-day Notice is Center Point, LLC.

**ENTITY ADDRESS**

Center Point, LLC
Attn: Mr. Makram Hanna
P.O. Box 9225
Rancho Santa Fe, CA 92067

///

**ATTORNEY'S ADDRESS**

Mr. Jay Christofferson, Esq.
Wanger Jones Helsley, PC
265 E. River Park Circle, Suite 310
Fresno, CA 93720

## VIII. RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including state or local agencies, individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter. **These provisions of law currently authorize civil penalties of $56,460.00[5] per day, for each violation occurring on or after January 1, 2017. Knowing or willful violations are subject to heightened civil penalties.**

In addition to civil penalties, Center Point will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

**Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d) and California Code of Civil Procedure § 1021.5, Center Point will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred.**

## IX. CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. Center Point encourages the HSRA's counsel to contact Center Point's counsel within 20 days of receipt of this Notice to initiate a discussion regarding the violations detailed herein and how the HSRA may resolve this matter without the necessity of litigation. Please do not contact Center Point directly.

///

///

///

---

[5] This number is subject to further adjustment in accordance with the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

During the 60-day notice period, Center Point is willing to discuss effective remedies for the violations; however, if the HSRA wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period. Center Point reserves the right to file a lawsuit if discussions are continuing when the notice period ends.

Sincerely,

Jay A. Christofferson

Enclosure: Service List

**SERVICE LIST**

Eric Oppenheimer, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Patrick Pulupa, Executive Officer
Central Valley Regional Water Quality Control Board
11020 Sun Center Drive, #200
Rancho Cordova, CA 95670-6114

Valerie Quinto, Executive Officer
North Coast Regional Water Quality Control Board
5550 Skylane Blvd STE A
Santa Rosa CA 95403-1072

Eileen White, Executive Officer
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

Ryan E. Lodge, Executive Officer
Central Coast Regional Water Quality Control Board
895 Aerovista Place, Suite 101
San Luis Obispo, CA 93401-7906

Susana Arredondo, Executive Officer
Los Angeles Regional Water Quality Control Board
320 West Fourth Street, Suite 200
Los Angeles, CA 90013

Michael R. Plaziak, Executive Officer
Lahontan Regional Water Quality Control Board
2501 Lake Tahoe Blvd.
South Lake Tahoe, CA 96150

Paula Rasmussen, Executive Officer
Colorado River Regional Water Quality Control Board
73-720 Fred Waring Dr., Suite 100
Palm Desert, CA 92260

///
///

Jayne Joy, Executive Officer
Santa Ana Regional Water Quality Control Board
3737 Main Street, Suite 500
Riverside, CA 92501-3348

David Gibson, Executive Officer
San Diego Regional Water Quality Control Board
2375 Northside Drive, Suite 100
San Diego, CA 92108

Michael S. Regan, Administrator
United States Environmental Protection Agency
Office of the Administrator (Mail Code 1101A)
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Martha Guzman, Regional Administrator
United States Environmental Protection Agency, Region 9
75 Hawthorne Street
San Francisco, CA 94105